Leslie WEISS

v.

Theodore PATRICK, Jr., alias John Doe

v.

Albert TURNER, alias Richard Doe.

Civ. A. No. 75–0223.

United States District Court,
D. Rhode Island.

June 1, 1978.

John G. Hines, Providence, R. I., for plaintiff.

John A. Burgess, Montpelier, Vt., and Peter Rosedale, Providence, R. I., for defendants.

## OPINION

BOYLE, District Judge.

This is an action for damages brought by Plaintiff, Leslie Weiss, against Defendants, Theodore Patrick, Jr., and Albert Turner, alleging a conspiracy under the provisions of 42 U.S.C. § 1985(3) together with pendant claims for damages for assault and battery and false imprisonment.

The Complaint was filed July 22, 1975. It alleges that Plaintiff is an active member in a religious organization, and is entitled to freely practice her religion but that Defendants conspired to deny Plaintiff equal protection of the law. Plaintiff alleges that Defendants actively prevented her, through force, violence and intimidation from enjoying equal rights, privileges and immunities. The alleged conspiracy involved her right of freedom of interstate movement, speech, religion, association, assembly, her right to be secure in her person and her right not to be enslaved nor deprived of life and liberty other than by due process of law. Additional counts allege confinement of Plaintiff without legal justification, interference with her personal liberty by means of unconsented bodily contacts, and resulting mental suffering. The Complaint seeks compensatory and punitive damages.

In June of 1974, Plaintiff became a member of the Unification Church, members of which are popularly known as "Moonies". At that time she was age 23. She is the daughter of a physician and a professor of anatomy and physiology; and has one brother. Both her mother and father deceased prior to the time of trial; the father in September, 1977, and the mother in February, 1976. Plaintiff's health has been marred by emotional problems. Her mother first recognized emotional difficulties when the Plaintiff was a seventh grade student, and, until June of 1974 she was frequently under treatment for psychological or psychiatric problems. Plaintiff has not been treated for her emotional problems since she became a member of the Unification Church.

Plaintiff is possessed of above-average intelligence and successfully pursued collegiate studies on two occasions which ended because of her emotional problems. Although there is no contention and no doubt that she is competent, she is an extremely troubled person.

Following her initial membership in the Unification Church, in June of 1974, she trained for a time in Boston, Massachusetts, and later at Tarrytown, New York. Thereafter, she joined a mobile fund raising team in Ohio, where she did "indemnity" by vending items for sale in various locations. Indemnity was defined as a process of life which all must pay in order to cure the separation between God and mankind.

Plaintiff's mother became ill with cancer and the Church authorities authorized Plaintiff to visit her mother at Thanksgiving in November of 1974. Plaintiff flew from Columbus, Ohio, to Boston, Massachusetts, on November 27, 1974, arriving in Boston in the early morning hours. She was met by her mother at the airport, and was driven to her mother's home where she slept for a time. Her mother told her of plans to have Thanksgiving dinner with friends and told Plaintiff that she had a surprise in store for her. At approximately 2:00 P.M. on the same day, a Mr. Dixon arrived and drove Plaintiff and her mother to a nearby shopping center. Mr. Dixon was identified by Plaintiff at trial as the Defendant Turner. At the shopping center, Plaintiff met Shelly Turner, Mr. Turner's daughter, whom she had known as a member of the Unification Church.

Defendant Turner, Shelly Turner, Plaintiff's mother and Plaintiff traveled from Massachusetts to the Turner home in Warwick, Rhode Island, in an automobile operated by Defendant Turner. Plaintiff was met "warmly" at the Turner home by Defendant Turner's family, and was taken to a nicely furnished basement. When seated, Plaintiff was approached by a black man, later identified as Defendant Theodore Patrick, Jr., who stated:

"My name is Black Lightning, and I have flown here all the way from my home in California just to talk to you this afternoon."

The basement area was described as an area 25 feet by 15 feet, modestly furnished with one doorway. The occupants sat in a circle, which included Plaintiff, her mother, the Turner family and Black Lightning.

Plaintiff testified that Defendant Patrick told her she was out of her "right mind," that she had been deprived of her free will and was worshiping Satan, and that "they were going to take as long as it was necessary to force me to change my mind." Plaintiff testified that she sought to leave.

"[I]t seemed to me that everybody in that room was on top of me restraining me from getting to that door[1] . . .. [S]everal people actually had their hands on me physically, but there was one tremendous force coming from Mr. Turner, and he grabbed me very harshly by the shoulders and slammed me violently into a chair, and pinned me there, and I was greatly hurt. My whole body was hurt, writhing with pain. I was shocked; I was frightened; I was angry at this restraint of my freedom, and he must have held me there for a few minutes, one or two minutes, but at the time it seemed like a very long time."

Plaintiff testified that she was then told by Mr. Patrick that he was there to "deprogram me." Plaintiff stated that she realized Defendants Turner and Patrick were prepared to use force to

"detain me against my will so I decided that it would be easier for me to go along and pretend that their deprogramming tactics were influencing me, and that I was gradually and gradually being deprogrammed."

Plaintiff further testified that she asked everyone to leave the basement area.

"[A]nd I talked to Mr. Turner and told him that I thought he was very concerned about me, that he was very courageous to be trying to rescue me, that I thought

---

1. Photographs in evidence establish the existence of a doorway or archway, but not a door.

that he must be really concerned to be going to this great extent to get me free, and I was pretending to be deprogrammed and pretending to act that I trusted him."

(Later testimony makes it clear that Defendant Patrick, not Defendant Turner was then alone with Plaintiff.)

Plaintiff testified that there came a time when she acted as if she were in agreement with the deprogramming process.

"I told him that I considered him to be concerned, and courageous, and I thanked him for liberating me from my illusions."

She testified that she made no further indication that she wished to leave. The basement discussion continued for approximately four (4) hours. Then Plaintiff with her mother, Defendant Patrick, Defendant Turner and his family and a number of relatives of the Turner family sat down to a two (2) hour Thanksgiving dinner in an upstairs dining room. Thereafter, Plaintiff took a nap on the living room sofa. Plaintiff then retired to a bedroom which was also occupied by her mother and Shelly Turner. Plaintiff described the room as having one window, where Shelly Turner's bed was located, and one doorway, across which her mother's bed was later placed, and Plaintiff testified she assisted in moving her mother's bed. Plaintiff testified:

"I thought I better had give help. I thought I better comply with anything they asked me to do."

Plaintiff testified that about 5:00 o'clock on the following morning she attempted to leave by moving her mother's bed, but woke her and was unable to move the bed. Plaintiff arose with the other occupants of the household between six and seven in the morning. At this time, both Defendant Patrick and Defendant Turner had left the Turner home. Plaintiff testified that later on she was allowed to roam about the house. She stated:

"I had been trying ever since I talked to Ted Patrick in the basement to convince Ted Patrick and my mother and Mr.

Turner and Mrs. Turner and Shelly Turner, that I was agreeing with everything that they said, and that I was being deprogrammed. I was being dissuaded of my religious beliefs. I was coming to my senses, and I became a great actress and, so they gradually relaxed their controls on me the more they became convinced that I was being deprogrammed."

Plaintiff exited the Turner house later that morning through a bedroom window, jumping eight (8) to ten (10) feet to the ground. Plaintiff went first to a nearby home, then to a nursing home, one block away. There she attempted to call members of the Unification Church when her mother "caught up with her" in a telephone booth. She ran to a medical building nearby. The police were called and Plaintiff was taken back to the Turner home, and upon her refusal to enter, she was taken to Butler Hospital in a police car. At the hospital, Plaintiff testified that she

"pretended that I had what deprogrammers call a relapse or a floating experience where they momentarily flip back into their old beliefs and try to make an attempt at their freedom. I acted as if I had such a relapse and then pretended that I was now coming back into my deprogrammed state, saying that I wanted to be helped; that I wanted to get my mind straightened out, and I was sorry."

Plaintiff remained at Butler Hospital for four (4) days and was allowed to leave when she asked to leave. At the hospital, she testified she had migraine headaches, nausea and gastrointestinal upsets, and that the upsets continued after she left the hospital.[2] She further testified, "Sometimes I still fear traveling alone." She testified that this fear of traveling alone restricted her relationship with her mother as she was "forced to choose between my relationship with my mother and my own freedom."

Shelly Turner's testimony concerning the basement episode was somewhat different from Plaintiff's version. She stated that Plaintiff said she wanted to leave.

---

**2.** Although the hospital record at Butler Hospital was introduced as an exhibit for identifica-
tion, neither Plaintiff nor Defendants moved its admission as a full exhibit.

"She bolted up, she ran into my father. My father [Defendant Turner] asked her to please sit down. My mother [Mrs. Turner] come over and said something like 'Janie [Leslie], please sit down.' And then her mother [Mrs. Weiss] had said something. I don't remember exactly what. I said something to Leslie. She went over, very calmly, and sat down again."

She also testified that there were two windows in the bedroom where Plaintiff and Plaintiff's mother slept, and that Plaintiff's mother's bed was not placed across the doorway.

The credible evidence is, and the Court finds the facts to be as follows: Plaintiff willingly accompanied her mother to the Turner home for Thanksgiving dinner, where she met and talked with Defendant Patrick who had been hired and paid by Plaintiff's mother to convince Plaintiff to change her way of life. Plaintiff willingly listened, enjoyed dinner, napped, slept fitfully and, thereafter, determined to exit dramatically. Defendants and Mrs. Weiss indeed intended to change Plaintiff's mind by their actions, but the Court finds no credible evidence of improper action.

There are a number of reasons why Plaintiff's version of the facts which allegedly transpired at Defendant Turner's home is not credible. To begin with, her mother, who was terminally ill, was present as were a number of other persons when the supposed incident occurred. Although Plaintiff's mother's deposition was taken when she was known to be terminally ill, and was introduced as evidence, she was not asked to either corroborate or deny Plaintiff's account of what occurred at the Turner home.

. In spite of the traumatic and vivid description of the events provided by Plaintiff, she suffered no treatable or apparent physical injury. The facts that she ate well, napped, and moved about at will prior to her "escape" are distinctly contrary to a claim of traumatic infliction of psychic injury.

Plaintiff alleges physical and emotional disturbance as a result of her experience. The Court finds, however, that there is no credible evidence of such injury. Plaintiff has not proved that the state of Plaintiff's emotional health changed in any manner as a result of her alleged confinement. Indeed, she testified that she had not been treated for her emotional problems since she joined the Unification Church either before or after the alleged "kidnapping." Other than her own assertions and those of two members of the Unification Church, the only medical witness who testified for Plaintiff was Doctor William Leslie Bergman. Doctor Bergman had some psychiatric training incident to his medical training and served a six month psychiatric internship. For the past five and one-half years he has been a teacher and spiritual counselor in the Unification Church and has served as regional director for the Church in the western United States. He was aware of Plaintiff's emotional instability prior to her alleged "kidnapping." He testified that Plaintiff was severely agitated, which he believed was caused by "kidnapping" and 20 hours of "deprogramming." His opinion was that Plaintiff was suffering from an acute anxiety reaction. He testified, however, that he was not making a diagnosis, and was not an expert in psychiatry. His opinion was an impression. Further, he was not familiar with Plaintiff's history of prior treatment for emotional difficulty. The testimony falls far short of proof that Plaintiff suffered emotional disturbance caused by Defendants.

■ This Court has a clear mandate to protect private individuals from infringement of their civil rights, that is, those rights and guaranties embodied in the Constitution and laws of the ·United States. Any violation of civil rights legislation which denies an individual equality before the law because of characteristics generally attributable to a group requires decisive remedial action. Before launching upon a review of remedy, however, the Court must find evidence of a violation of Plaintiff's civil rights. On the basis of all the evidence presented, the Court is not persuaded that

Plaintiff's civil rights were infringed by Defendants' actions so as to constitute a violation of 42 U.S.C. § 1985(3) as alleged.

Plaintiff has failed to prove that she suffered deprivation of any federally protected right. At trial, both Defendants invoked their privilege against self-incrimination. It must be taken as true, and the Court so finds, that they combined with Plaintiff's mother for a joint purpose to influence Plaintiff's membership in the Unification Church and to persuade her to leave the Unification Church. The Court holds that Defendants' actions constitute a proper exercise of their constitutional right to speak freely to a willing listener.

■ Plaintiff's mother has the parental right to freely advocate a point of view to her daughter, be she minor or adult. Defendants have the right which all citizens have, to peaceably dissuade Plaintiff of her particular religious views, provided they use no form of unlawful compulsion to effect their purpose. What occurred here was simply an effort, in private, to persuade a willing listener to disavow the tenets of the Unification Church. To hold otherwise would be to deny Defendants their First Amendment right to freedom of speech, one of the very rights which Plaintiff herself asserts as the basis of her civil rights claim.

As the Supreme Court said in *Cantwell v. Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940):

> "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

It is clear that Plaintiff has the right to be free of any coercive attempt to speak with her but it is equally clear that without such coercion, her most adequate remedy is simply the refusal to listen. *Grossberg v. Deusebio*, 380 F.Supp. 285 (E.D.Va.1974).

■ In our civilized society, the free exchange of ideas is essential and thus "the right of every person 'to be left alone' must be placed in the scales with the right of others to communicate." *Rowan v. United States Post Office Department*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970).

Absent a situation where one is truly a "captive" listener, the balance of the scales tips in favor of those wishing to communicate. The solution then for a listener whose sensibilities are injured by offensive or insulting speech is simply to close his or her ears or depart. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

The credible evidence in this action establishes that Plaintiff did not choose to avail herself of the remedy of not listening or departing. Instead, she chose to remain in the Turner home and hear out Defendants. She went so far as to praise them in their efforts to "deprogram" her. Plaintiff's assertions that she was compelled to listen or forced into the pretense of listening cannot be believed. Absent compulsion, freedom of speech and freedom of religion are not to be used as devices to achieve the denial of the same rights to others.

This Court cannot consider Plaintiff's alleged feigned acquiescence as establishing that either Defendant unlawfully deprived Plaintiff of her constitutional rights. By Plaintiff's own testimony, she gave the appearance of acquiescence and acceptance. Plaintiff seeks to excuse her apparent acceptance of Defendants' efforts by claiming that it was created by intimidation, and, therefore, *ab initio*, illegal. Plaintiff's argument seems to be that in effect she successfully deceived Defendants, and thereby Defendants violated her rights. This is too slender and too dangerous a distinction to form the premise for § 1985(3) liability,

particularly since Plaintiff's present posture may equally be explained by a desire to excuse, after the fact, her apparent acceptance of the effort to "deprogram" her to herself. Equally likely inferences concerning Plaintiff's behavior are not sufficient to carry Plaintiff's burden of proof.

 Furthermore, the Court finds no credible evidence of assault and battery or false imprisonment. Her lack of apparent injury and subsequent voluntary commitment for four (4) days at Butler Hospital is evidence that any limitation upon her personal mobility was not her primary concern. Plaintiff has failed to prove a deprivation of any constitutional rights within the meaning of the Statute.

In order to recover damages for a conspiracy to violate her civil rights, Plaintiff must allege and prove a violation of 42 U.S.C. § 1985(3).[3] Based on the facts as found by this Court, Plaintiff fails to prove a cause of action under § 1985(3) as construed by the Supreme Court in *Griffin v. Breckenridge*, 403 U.S. 88, 102–103, 91 S.Ct. 1790, 1798–1799, 29 L.Ed.2d 338 (1971).

> "To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of [the] conspiracy,' whereby another was (4a) *'injured in his person or property'* or *(4b)* *'deprived of having and exercising any right or privilege of a citizen of the United States.'* " (Emphasis added.)

 Plaintiff's proof in this case is fatally defective in that she fails to show an essential element of a § 1985(3) claim, that is, the element of injury. In order to recover damages for a conspiracy to deprive one of his or her civil rights, one must be injured in person or property, or there must be an in-fact deprivation of some federally protected civil right. *Bellamy v. Mason's Store's, Inc.*, 508 F.2d 504 (4th Cir. 1974); *Dells, Inc. v. Mundt*, 400 F.Supp. 1293 (S.D. N.Y.1975); *Grisom v. Logan*, 334 F.Supp. 273 (C.D.Cal.1971). There is no such injury or deprivation proved by Plaintiff.

 There is a further compelling reason to deny Plaintiff recovery in this case. The Supreme Court in *Griffin* made it clear that Congress did not intend that § 1985(3) be viewed as an all-embracing federal tort law intended to apply to all tortious conspiratorial interferences with the rights of others. *Griffin*, 403 U.S. at 102, 91 S.Ct. 1790. *Jackson v. Cox*, 540 F.2d 209 (5th Cir. 1976); *Abbott v. Moore Business Forms, Inc.*, 439 F.Supp. 643 (D.N.H.1977); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971). In order to avoid the "constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law," the Supreme Court gave a limited construction to the statutory language requiring intent to deprive of equal protection, or equal privileges and immunities. "[Such language] means that there must be some racial, or otherwise class-based invidiously discriminatory animus behind the conspirators' actions." *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798. In other words, the conspirators need not have the actual intent to deprive one of his or her civil rights if their acts are motivated by some invidiously discriminatory animus.

 Again, Plaintiff's proof fails to show the existence of a critical element, the existence of a class-based animus.[4] While

---

**3.** The Court need not reach the question whether the facts alleged constitute a proper jurisdictional basis under § 1985(3), since the facts as found make it unnecessary to do so. Apart from Plaintiff's claim of interference with her right to interstate travel, the Court does not decide whether a private conspiracy infringing on First Amendment rights without state action is reachable by § 1985(3).

**4.** The Court need not decide the question whether the religious followers of the Reverend Moon constitute a class for purposes of § 1985(3) protection. See *Baer v. Baer*, 450 F.Supp. 481, (N.D.Cal. 1978).

it may be true that Defendants disapprove of the views of the Unification Church, there is not sufficient evidence to suggest that this factor alone translates into the required animus under § 1985(3). In fact, it was shown, and this Court finds, that Defendants' actions were primarily, if not entirely, motivated by the maternal concerns of Plaintiff's mother. Mrs. Weiss' actions, which resulted in her combination with Defendants, arose not from her abhorrence of the Unification Church *per se*, but rather arose directly from the solicitude which a mother holds for her daughter's health and well-being. Defendants, as agents of Mrs. Weiss, derived their motivation from this same maternal solicitude. Whenever an alleged conspirator's actions are directed against one as an *individual,* and not because that individual is a member of a particular class, a cause of action under § 1985(3) is not proved. *Griffin,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338; *Kletschka v. Driver,* 411 F.2d 436, 447 (2d Cir. 1969); *Brainerd v. Potratz,* 421 F.Supp. 836, 840 (N.D.Ill.1976).

Plaintiff's Complaint is denied and dismissed and judgment shall enter for Defendants for their costs.