A. J. KLEIDON AND ANOTHER v. JOSEPH T. GLASCOCK.[1]

June 18, 1943.

No. 33,353.

[1]Reported in 10 N. W. (2d) 394.

418

*J. A. A. Burnquist,* Attorney General, and *Edward J. Devitt* and *Ralph A. Stone,* Assistant Attorneys General, for appellant.

*Rudolph E. Low,* for respondents.

JULIUS J. OLSON, JUSTICE.

Two actions for false imprisonment, based upon substantially the same facts, were tried together below and are so submitted here. There were verdicts for plaintiffs against defendant, who appeals from an order denying his alternative motion for judgment or a new trial in both cases.

Plaintiffs are husband and wife. The husband's verdict was for $150 and that of his wife $300. As to the amount thereof, no complaint is made. Liability in any sum is challenged, however, on the ground that each verdict is without support. Specifically, this is defendant's claim:

"The verdicts are contrary to law, and are not sustained by the evidence; to permit them to stand would be to permit verdicts to rest on what the trial court held was false testimony. In the cir-

cumstances of this case it was the duty of the trial judge to grant a new trial and a denial thereof was an abuse of discretion."

Both actions were originally brought against several defendants, but all of them except Glascock were eliminated before submission of the issues to the jury. Therefore, hereinafter we shall refer to him as the defendant.

The cases have for their foundation a fire thought to be of incendiary origin. At the time of the fire plaintiffs were unmarried, plaintiff Florella having been employed as Albert J. Kleidon's housekeeper. Their marriage took place May 16, 1940.

Over a period of some seven years Mr. Kleidon operated a tavern in rural Anoka county. The building was upon land held under a lease which by its terms would end the leasehold December 31, 1939. Shortly after midnight between November 13 and 14, 1939, the tavern building with its contents was wholly destroyed by a fire originating within the building. The owner of the land on learning of the fire immediately (November 14) reported the matter to the county attorney, who directed that an investigation of the cause of the fire be made. Accordingly, he notified the state fire marshal. Defendant, a deputy marshal, was assigned to the job and promptly took the matter in hand with the aid of a deputy sheriff, one Auspos.

During the late afternoon of November 13, 1939, plaintiffs drove "up to beyond Onamia, by Mille Lac there," on a duck hunting trip, reaching their destination at about nine o'clock. The next morning, and before they had accomplished anything in respect to the purpose of the trip, Mr. Kleidon was informed over long-distance phone that the tavern had burned down early that morning. They started back without delay. Shortly after their arrival there defendant and Auspos had arrived at the scene and had interviewed several persons who were thought to be of aid in tracing the origin and cause of the fire, among them Kleidon's barkeeper, one Tom Tracy. On November 18, defendant and Auspos came to question plaintiffs. Defendant told Kleidon, "You better get your coat on and come along with us." They wanted to ask "a few questions." As to

Florella, Glascock said, "You better get your coat on and come along too." They were taken to the Anoka town hall, in which is located the common jail. As to what then occurred, Florella testified: "they took him [Kleidon] first and kept me outside * * * on the sidewalk out there, * * * one of them stayed with me while the other one went in." Later she was taken to the office, where she was questioned regarding her knowledge of the fire. Defendant told her "he was going to lock me up there, let me suffer so I would talk." She was held in confinement from the evening of November 18 to the 22d, when she was discharged. No warrant or other charge was ever brought against her. While so held she was furnished a small iron cot, a single blanket, but no mattress or pillow. The following portion of her testimony is revealing:

"Q. When he [Glascock] got you into the jail there, did he order you locked up or what were the circumstances under which you were locked up?

"A. Well, he told Mike [deputy sheriff], he said he was going to lock me up, have me locked up.

"The Court: Tell us exactly.

"Witness: Have me locked up so I would suffer; when I got out of there, he said I would feel like talking.

"Q. Did you object to that or stay there willingly?

"A. No; I thought I was only going to be in there a little while, and later on he questioned me again, and I never seen him after that any more.

"Q. Did you remain in the jail willingly?

"A. Well, I askéd to get out, I asked the sheriff. He said he couldn't do it.

"Q. Did he say why he couldn't do it?

"A. Well, he had to get a *habeas corpus* to get me out."

*     *     *     *     *

"Q. Did Mr. Glascock ask you to sign a paper, the statement that he had taken from you that evening?

"A. Yes.

"Q. He wrote down the answers to all of his questions, did he?

"A. Yes.

"Q. And you signed the paper?

"A. Yes."

The statement was received in evidence at the trial. We have read it and find nothing in it at all questionable of her candor and fairness. There is nothing in it incriminating either plaintiff.

As to what happened after plaintiffs reached Anoka, Mr. Kleidon testified that they took him "right to the jail" and put him in there immediately and "never asked me a question." About an hour and a half later "they sent down for me again and got me out of jail and he [Glascock] asked me a few questions, and he says, 'Put him back in again, he won't answer anything,' and he put me back in." "He ordered me in jail and someone else took me, locked me up. I wasn't in jail at all, I was down in the basement some place. I wasn't in jail until, I think it was Monday night." The basement referred to was in the fire barn, which is combined with the jail. It was characterized by him as "a dungeon in the jail." He asked the sheriff if he could "see an attorney" and was told, "Mr. Glascock ordered him [the sheriff] not to let me see anyone until he [Glascock] saw me again." On November 19 defendant took Kleidon to St. Paul to the Public Safety Building for further questioning. They were there about two hours, after which he was taken back to Anoka by "his [Glascock's] assistant." On this occasion:

"He [Glascock] told me to make out some kind of a receipt or something, to turn the policy back to the company and he would let me go then.

"Q. Is that what he told you?

"A. Yes, otherwise I was going to jail.

* * * * *

"Witness: He told me to make out a paper and turn back the insurance policy to the Austin Mutual Insurance Company, then I would be free, I wouldn't be put in jail, in prison, rather.

"Q. What did you say?

"A. I told him 'No.' I says he could make out a statement himself what he wanted, so he made one out and wanted me to sign it and I wouldn't sign it."

The statement to which the witness refers was prepared by defendant, introduced in evidence as plaintiffs' exhibit C, and reads:

"I, Albert J. Kleidon living at the intersection of Highways #8 and 49, at Rice Lake, Centerville Township, Anoka County, Minnesota, do hereby waive any and all claim to the $1900. Insurance policy for fire in the Austin Mutual Insurance Company, covering the building operated by me, and known as Al's Tavern, situated as described above, as a result of the fire which destroyed this tavern on or about November 14th, 1939."

Returning to Anoka, Kleidon was placed in the same room in the basement of the jail building and stayed there until Monday, the 20th. He saw his attorney Monday afternoon. On Tuesday, November 21, he was placed in the regular jail. Up to that time no warrant had been served or other legal documents presented to him by anybody. His attorney and the sheriff came in on Wednesday, the 22d, and "told me that my wife got out but there was a warrant for me, that I couldn't get out." He remained in jail until the 29th, when he was taken before the municipal court. Prior to that he had been given no opportunity to post bond or secure a release.

Defendant in his answer to each complaint (paragraph 3):

"Admits that he was instrumental in causing the apprehension of plaintiff; that he did so in his capacity as Deputy State Fire Marshal of the State of Minnesota, acting under the orders and direction of his superior, the State Fire Marshal, and at the specific direction and upon the advice of the County Attorney of Anoka County; and, that his action was justified."

He testified with regard to the trip to Anoka that he "requested them to come along and they went along voluntarily." He had no warrant nor even the scratch of a pen from anyone to warrant taking plaintiffs in charge.

Arriving at Anoka, defendant "asked Mr. Auspos if he would take Mr. Kleidon somewhere until I had an opportunity to talk with him, I wished to talk to the lady who was with Mr. Kleidon first. So Mr. Auspos took Mr. Kleidon and put him down in the basement." And further, that he told Auspos, "I would like to hold Mr. Kleidon for the county attorney."

"Q. But you did tell Mr. Auspos that you would like to have Mr. Kleidon held?

"A. For Mr. Walsh.

"Q. Held?

"A. Retained, held, yes, sir.

"Q. And you know that he was then held?

"A. Yes, sir.

"Q. Retained?

"A. Yes, sir.

"Q. But it is your statement you don't know whether he was held upstairs or downstairs or where he was held?

"A. That was no concern of mine."

No one had made any charge against either plaintiff of having burned, or being in any way connected with burning, the place. Defendant is the only one who made such a charge.

"Q. You charged them with burning the place?

"A. I charged Mr. Kleidon, I appeared against him in municipal court at Anoka as a witness."

With regard to plaintiffs' exhibit C, Glascock's claim is related by him as follows:

"Well, we arrived at the Public Safety Building. Mr. Kleidon said, 'I lied to you last night; I want to straighten the whole thing out and tell the truth; if you waive this insurance, I have got the girl in trouble, and waive my insurance.' I said, 'I have no interest in the insurance, I have nothing to do with the insurance. If you care to waive the insurance, here is a piece of paper.' He says, 'I am too nervous, you typewrite it.' I put this waiver on the type-

writer. He said, 'I talked to Mr. Blanchard Sunday morning, and I better see him before I sign it.' I said, 'Mr. Kleidon, that is entirely up to you.'"

Defendant does not dispute the fact that he—

"wished him [Kleidon] to accompany me to St. Paul where we could be alone to talk; so I drove to the Public Safety Building in St. Paul, and I told Mr. Kleidon when I was alone with him in the office there, I said: 'Al, you have lied about the whole thing.' I said, 'You do know something about the fire.' He said, 'Yes, I did lie to you last night. I have got the woman in trouble, and if I can release my insurance and forget the whole thing and let us out of it.' I said, 'Al, I have no right or privilege to release any insurance.' He said, 'I will sign a statement releasing it.' So I handed him my fountain pen and a piece of paper. He said, 'No, I am too nervous to sign it. You write it up on the typewriter.' So I wrote a short statement on the typewriter, at which time I handed—"

It was after this that defendant "took him" (Kleidon) back to Anoka.

A day or so prior thereto defendant had talked to Tom Tracy, Kleidon's bartender. He was taken from the place where the tavern had been "to our office in St. Paul and questioned." Mr. Tracy's statement is found in the record, and we have read it with care. Nowhere therein is there the slightest room for suspicion that the plaintiffs had anything to do with the fire that caused the destruction of the tavern and its contents. Tracy was in charge of the place and slept in a near-by trailer house. He is the only one that had a key to the tavern, the other key being in the possession of Mr. Kleidon, who was then far away near Mille Lacs Lake. Instead of directing suspicion against Mr. Kleidon or Florella, Tracy explains everything that took place from the time they left until the fire was discovered and the property destroyed. He and he alone was in the building at the time he closed it, shortly before midnight. He was awakened about an hour or an hour and a half later when

the light from the burning building struck the window of the cabin in which he was sleeping.

■ False imprisonment has been defined as "any imprisonment which is not legally justifiable." 3 Dunnell, Supp. § 3728; Vernes v. Phillips, 266 N. Y. 298, 194 N. E. 762, 763.

■ In Anderson v. Averbeck, 189 Minn. 224, 225, 248 N. W. 719, we said:

"Even though an arrest be lawful (which it no doubt was in this instance) a detention of the prisoner for an unreasonable time without taking him before a committing magistrate will constitute false imprisonment."

■ In the same case at the same page, we also held:

"All those who by direct act or indirect procurement personally participate in or proximately cause the false imprisonment or unlawful detention are joint tortfeasors." (Citing numerous authorities.)

■ We find no difficulty in holding that the verdicts find ample support in the evidence. The court in its instructions followed closely the language we have quoted, and added:

"Whoever was responsible for detaining A. J. Kleidon from November 18 and 19 to November 29, 1939, before causing him to be brought before a magistrate for a preliminary hearing or an opportunity to give bail, and Florella Kleidon until November 22, when she was released, caused them to be deprived of their liberty for an unreasonable length of time, spelling false imprisonment."

Since there was no exception taken to the charge at the trial or on the motion for new trial, we may not now overturn the result reached by the triers of fact. We are not intimating that the quoted language is erroneous in any respect.

■ Lastly, defendant contends that because of certain language used by the trial court in its memorandum, not made a part of the order, it was prejudicial error not to grant the motion for a new trial. The judge expressed himself thus:

"While the court emphatically disagrees with the finding of the jury, it is not prepared to say 'that the jury failed to consider all the evidence or acted under some mistake or from some improper motive, bias, feeling or caprice, instead of dispassionately and honestly exercising their judgment upon all the evidence.' "

His view of the testimony of Mrs. Kleidon was that it was "manufactured out of 'whole cloth' by her, a vitally interested party."

In the recent case of Ross v. D. M. & I. R. Ry. Co. 207 Minn. 157, 165, et seq., 290 N. W. 566, 571, we had occasion again to consider the effect of a memorandum not expressly made a part of the order for review. We there quoted with approval from Alton v. C. M. & St. P. Ry. Co. 107 Minn. 457, 459, 120 N. W. 749, 750, the following:

"The order granting the new trial in this case is clear and positive, and its correctness must be determined without reference to the memorandum, which is no part of it."

Our conclusion was, as stated in the fourth syllabus paragraph, that "a memorandum filed with but not made a part of the order may be examined for the purpose of ascertaining the trial court's reason for making the order." We there discussed our prior cases which held that it is not permissible to make use of such statements to impeach, contradict, or overcome express findings or conclusions based on the decision or order. The Ross case, as will be observed from a careful reading of it, does not overturn our prior cases. The memorandum therein was referred to because, from its language, we thought it (207 Minn. 168, 169, 290 N. W. 572) "clearly indicates that the trial court found no passion or prejudice" affecting the verdict. And, since "the record fully justifies such a finding," therefore, "having reached that conclusion, we are not concerned with the reason for the reduction" of the size of the verdict.

The Ross case aside, we are persuaded that the trial judge did not intend to, nor did he, abdicate his discretionary authority to pass upon the motion before him. He is not that type of judge. Rather, and only, he disagreed with the verdict as he viewed the evidence from the standpoint of a trier of fact, obviously a jury

function. Accordingly, he concluded that since the jury had exercised honest and unbiased judgment in reaching their verdicts, and there was competent evidence adequate and sufficient to sustain them, therefore they should stand. With that view we are in accord.

Order affirmed.

[1]Reported in 10 N. W. (2d) 373.