Susan Louise PETERSON, Appellant,

v.

Paul SORLIEN, Respondent,

Norman Jungclaus, et al., Respondents,

Michele Perkins, Respondent.

No. 48721.

Supreme Court of Minnesota.

Oct. 24, 1980.

Ranum, Quackenbush & Burke and James H. Ranum, Minneapolis, for appellant.

Gray, Plant, Mooty, Mooty & Bennett and Jeffrey R. Brooke, Minneapolis, for Sorlien.

Joseph W. Parris, Hector, for Jungclaus et al.

Wasserman & Lewis and Mark S. Wasserman, Minneapolis, for Perkins.

Heard before SHERAN, C. J., and OTIS, PETERSON, KELLY, TODD, YETKA and MAXWELL, JJ., and considered and decided by the court en banc.

SHERAN, Chief Justice.

This action by plaintiff Susan Jungclaus Peterson for false imprisonment and intentional infliction of emotional distress arises from an effort by her parents, in conjunction with other individuals named as defendants, to prompt her disaffiliation from an organization known as The Way Ministry.

At trial, the Hennepin County District Court directed a verdict in favor of defendant Paul Sorlien, plaintiff's former minister, finding the evidence proffered against

him insufficient as a matter of law. The jury returned a verdict exonerating Mr. and Mrs. Jungclaus and the other remaining defendants of the charge of false imprisonment; however, the jury found defendants Veronica Morgel and Kathy Mills liable for intentional infliction of emotional distress, assessing against each of them $1 compensatory damages and $4,000 and $6,000 respectively as punitive damages.

Plaintiff asserts that the trial court erred by 1) failing to grant a judgment notwithstanding the verdict on the claim of false imprisonment; 2) permitting the admission of evidence concerning her involvement in The Way and its activities; 3) instructing the jury that in assessing plaintiff's credibility it could consider whether others than plaintiff were participating in the expense of the litigation; 4) directing a verdict in favor of Paul Sorlien; and 5) denying her motion to amend the complaint to substitute the proper names of defendants previously identified as John Doe, James Roe, Jane Doe and Mary Roe and to add a new cause of action.

We find that if the trial court erred in its jury instruction which outlined the factors that could be considered in assessing plaintiff's credibility and by failing to permit the substitution of proper names for defendants otherwise identified in the complaint, these errors were not of a fundamental magnitude. In all other respects, we affirm the determination of the district court.

Viewing the evidence in the light most favorable to the prevailing defendants, this case marks the emergence of a new cultural phenomenon: youth–oriented religious or psuedo–religious groups which utilize the techniques of what has been termed "coercive persuasion" or "mind control" to cultivate an uncritical and devoted following. Commentators have used the term "coercive persuasion," originally coined to identify the experience of American prisoners of war during the Korean conflict to describe the cult–induction process. The word "cult" is not used pejoratively but in its dictionary sense to describe an unorthodox system of belief characterized by "[g]reat or excessive devotion or dedication to some person, idea, or thing." *Webster's New International Dictionary of the English Language Unabridged* 552 (1976). Coercive persuasion is fostered through the creation of a controlled environment that heightens the susceptibility of a subject to suggestion and manipulation through sensory deprivation, physiological depletion, cognitive dissonance, peer pressure, and a clear assertion of authority and dominion. The aftermath of indoctrination is a severe impairment of autonomy and the ability to think independently, which induces a subject's unyielding compliance and the rupture of past connections, affiliations and associations. *See generally* Delgado, *Religious Totalism: Gentle and Ungentle Persuasion under the First Amendment*, 51 S.Cal.L.Rev. 1 (1977). One psychologist characterized the process of cult indoctrination as "psychological kidnapping." *Id.* at 23.

At the time of the events in question, Susan Jungclaus Peterson was 21 years old. For most of her life, she lived with her family on a farm near Bird Island, Minnesota. In 1973, she graduated with honors from high school, ranking second in her class. She matriculated that fall at Moorhead State College. A dean's list student during her first year, her academic performance declined and her interests narrowed after she joined the local chapter of a group organized internationally and identified locally as The Way of Minnesota, Inc.

The operation of The Way is predicated on the fund-raising activities of its members. The Way's fund-raising strategy centers upon the sale of pre–recorded learning programs. Members are instructed to elicit the interest of a group of ten or twelve people and then play for them, at a charge of $85 per participant, a taped introductory course produced by The Way International. Advanced tape courses are then offered to the participants at additional cost, and training sessions are conducted to more fully acquaint recruits with the orientation of the group and the obligations of membership. Recruits must contribute a minimum of 10 percent of their earnings to the organ-

ization; to meet the tithe, student members are expected to obtain part–time employment. Members are also required to purchase books and other materials published by the ministry, and are encouraged to make larger financial contributions and to engage in more sustained efforts at solicitation.

By the end of her freshman year, Susan was devoting many hours to The Way, listening to instructional tapes, soliciting new members and assisting in training sessions. As her sophomore year began, Susan committed herself significantly, selling the car her father had given her and working part–time as a waitress to finance her contributions to The Way. Susan spent the following summer in South Dakota, living in conditions described as appalling and overcrowded, while recruiting, raising money and conducting training sessions for The Way.

As her junior year in college drew to a close, the Jungclauses grew increasingly alarmed by the personality changes they witnessed in their daughter; overly tired, unusually pale, distraught and irritable, she exhibited an increasing alienation from family, diminished interest in education and decline in academic performance. The Jungclauses, versed in the literature of youth cults and based on conversations with former members of The Way, concluded that through a calculated process of manipulation and exploitation Susan had been reduced to a condition of psychological bondage.

On May 24, 1976, defendant Norman Jungclaus, father of plaintiff, arrived at Moorhead to pick up Susan following the end of the third college quarter. Instead of returning to their family home, defendant drove with Susan to Minneapolis to the home of Veronica Morgel. Entering the home of Mrs. Morgel, Susan was greeted by Kathy Mills and several young people who wished to discuss Susan's involvement in the ministry. Each of those present had been in some way touched by the cult phenomenon. Kathy Mills, the leader of the group, had treated a number of former cult members, including Veronica Morgel's son. It was Kathy Mills a self–styled professional deprogrammer, to whom the Jungclauses turned, and intermittently for the next sixteen days, it was in the home of Veronica Morgel that Susan stayed.

The avowed purpose of deprogramming is to break the hold of the cult over the individual through reason and confrontation. Initially, Susan was unwilling to discuss her involvement; she lay curled in a fetal position, in the downstairs bedroom where she first stayed, plugging her ears and crying while her father pleaded with her to listen to what was being said. This behavior persisted for two days during which she intermittently engaged in conversation, at one point screaming hysterically and flailing at her father. But by Wednesday Susan's demeanor had changed completely; she was friendly and vivacious and that night slept in an upstairs bedroom. Susan spent all day Thursday reading and conversing with her father and on Saturday night went roller–skating. On Sunday she played softball at a nearby park, afterwards enjoying a picnic lunch. The next week Susan spent in Columbus, Ohio, flying there with a former cult member who had shared with her the experiences of the previous week. While in Columbus, she spoke every day by telephone to her fiance who, playing tapes and songs from the ministry's headquarters in Minneapolis, begged that she return to the fold. Susan expressed the desire to extricate her fiance from the dominion of the cult.

Susan returned to Minneapolis on June 9. Unable to arrange a controlled meeting so that Susan could see her fiance outside the presence of other members of the ministry, her parents asked that she sign an agreement releasing them from liability for their past weeks' actions. Refusing to do so, Susan stepped outside the Morgel residence with the puppy she had purchased in Ohio, motioned to a passing police car and shortly thereafter was reunited with her fiance in the Minneapolis headquarters of The Way. Following her return to the ministry, she was directed to counsel and initiated the present action.

1. Plaintiff seeks a judgment notwithstanding the verdict on the issue of false imprisonment, alleging that defendants unlawfully interfered with her personal liberty by words or acts which induced a reasonable apprehension that force would be used against her if she did not otherwise comply. *Durgin v. Cohen*, 168 Minn. 77, 209 N.W. 532 (1926). The jury, instructed that an informed and reasoned consent is a defense to an allegation of false imprisonment and that a nonconsensual detention could be deemed consensual if one's behavior so indicated, exonerated defendants with respect to the false imprisonment claim.

The period in question began on Monday, May 24, 1976, and ceased on Wednesday, June 9, 1976, a period of 16 days. The record clearly demonstrates that Susan willingly remained in the company of defendants for at least 13 of those days. During that time she took many excursions into the public sphere, playing softball and picnicking in a city park, roller-skating at a public rink, flying aboard public aircraft and shopping and swimming while relaxing in Ohio. Had Susan desired, manifold opportunities existed for her to alert the authorities of her allegedly unlawful detention; in Minneapolis, two police officers observed at close range the softball game in which she engaged; en route to Ohio, she passed through the security areas of the Twin Cities and Columbus airports in the presence of security guards and uniformed police; in Columbus she transacted business at a bank, went for walks in solitude and was interviewed by an F.B.I. agent who sought assurances of her safety. At no time during the 13–day period did she complain of her treatment or suggest that defendants were holding her against her will. If one is aware of a reasonable means of escape that does not present a danger of bodily or material harm, a restriction is not total and complete and does not constitute unlawful imprisonment. Damages may not be assessed for any period of detention to which one freely consents. *See Davis & Allcott Co. v. Boozer*, 215 Ala. 116, 110 So. 28 (1926); *Restatement (Second) of Torts* § 36, Comment a (1965); 4 *Minnesota Practice JIG II*, 504 G–S (2d ed.1974).

In his summation to the jury, the trial judge instructed that to deem consent a defense to the charge of false imprisonment for the entire period or for any part therein, a preponderance of the evidence must demonstrate that such plaintiff voluntarily consented. The central issue for the jury, then, was whether Susan voluntarily participated in the activities of the first three days. The jury concluded that her behavior constituted a waiver.

We believe the determination to have been consistent with the evidence. *See Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147 (D.C.1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); F. Harper & F. James, *The Law of Torts* § 3.10, at 235 (1956). Were the relationship other than that of parent and child, the consent would have less significance.

To determine whether the findings of the jury can be supported upon review, the behavior Susan manifested during the initial three days at issue must be considered in light of her actions in the remainder of the period. Because, it is argued, the cult conditioning process induces dramatic and non–consensual change giving rise to a new temporary identity on the part of the individuals whose consent is under examination, Susan's volitional capacity prior to treatment may well have been impaired. Following her readjustment, the evidence suggests that Susan was a different person, "like her old self." As such, the question of Susan's consent becomes a function of time. We therefore deem Susan's subsequent affirmation of defendants' actions dispositive.

In *Weiss v. Patrick*, 453 F.Supp. 717 (D.R. I.), *aff'd*, 588 F.2d 818 (1st Cir. 1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979), the federal district court in Rhode Island confronted a situation similar to that which faces us. Plaintiff, a devotee of the Unification Church, brought an action for false imprisonment against individuals hired by her parents to prompt her disassociation from the church. Be-

cause plaintiff's mother was dying of cancer, the church authorities permitted her to join her family for the Thanksgiving holiday. Met at the airport by her mother, she testified that she was restrained against her will. in the home of one of the defendants and subjected to vituperative attacks against the church until she seized an opportunity to flee. Despite the evidently traumatic experience sustained by plaintiff, the district court found that she failed to demonstrate a meaningful deprivation of personal liberty, reasoning that "any limitation upon personal mobility was not her primary concern." *Id.* at 722. In so reasoning, the court underscored a parental right to advocate freely a point of view to one's child, "be she minor or adult." To assure freedom, the court observed, "the right of every person 'to be left alone' must be placed in the scales with the right of others to communicate." *Id.* (quoting *Rowan v. United States Post Office Department*, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970)).

▌ In light of our examination of the record and rules of construction providing that upon review the evidence must be viewed in a manner most favorable to the prevailing party, *Kuehl v. National Tea Co.*, 310 Minn. 48, 245 N.W.2d 235 (1976), we find that a reasonable basis existed for the verdict exonerating defendants of the charge of false imprisonment. Although carried out under colorably religious auspices, the method of cult indoctrination, viewed in a light most favorable to the prevailing party, is predicated on a strategy of coercive persuasion that undermines the capacity for informed consent. While we acknowledge that other social institutions may utilize a degree of coercion in promoting their objectives, none do so to the

same extent or intend the same consequences. Society, therefore, has a compelling interest favoring intervention. The facts in this case support the conclusion that plaintiff only regained her volitional capacity to consent after engaging in the first three days of the deprogramming process. As such, we hold that when parents, or their agents, acting under the conviction that the judgmental capacity of their adult child is impaired, seek to extricate that child from what they reasonably believe to be a religious or psuedo–religious cult, and the child at some juncture assents to the actions in question, limitations upon the child's mobility do not constitute meaningful deprivations of personal liberty sufficient to support a judgment for false imprisonment.[1] But owing to the threat that deprogramming poses to public order, we do not endorse self–help as a preferred alternative. In fashioning a remedy, the First Amendment requires resort to the least restrictive alternative so as to not impinge upon religious belief. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed.2d 1213 (1940).[2]

▌ 2. On appeal, plaintiff challenges the propriety of admissions by the trial court of evidence regarding her involvement in the activities of The Way. By charging defendants with intentional infliction of emotional distress and seeking punitive damages, plaintiff placed the state of mind of defendants at issue. For a court to award punitive damages, a plaintiff must prove that defendants acted willfully, wantonly and maliciously. Good faith is a proper defense to punitive damages, even though defendants might have been mistaken in their belief that a party was in jeopardy or that their actions were correct. *Ben-*

---

1. Plaintiff in her motion for a judgment notwithstanding the verdict stated that she wished to recover only nominal damages against her parents. This court has held that a judgment for defendant will not be reversed on appeal simply to allow a plaintiff to recover nominal damages. *Erickson v. Midland Nat'l Bank & Trust Co.*, 205 Minn. 224, 285 N.W. 611 (1939).

2. While we decline at this time to suggest a particular alternative, we observe that some courts have permitted the creation of temporary guardianships to allow the removal of cult members to therapeutic settings. If the individuals desire, at the end of the conservatorship they may return to the cult. Actions have also been initiated against cult leaders on the basis of criminal liability. *See generally* Delgado, *supra*, at 73–97.

**130**

*son Cooperative Creamery Association v. First District Association*, 276 Minn. 520, 151 N.W.2d 422 (1967). Therefore, in determining whether defendants acted with the requisite degree of malice, the trial court considered defendants' perceptions of The Way Ministry and their fears for Susan's well–being relevant and admissible.

 The ability of defendants to introduce testimony of their perception of the ministry's effect upon plaintiff must be weighed against the First Amendment admonition respecting the free exercise of religion. Although religious belief is protected absolutely from governmental regulation, religiously motivated conduct is subject to a balancing test that weighs the interest of the religious group against the state's interest in regulating or forbidding the activity. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). A court may also afford the interest of the religious group less weight if it considers the belief giving rise to the conduct insincerely held, or if the practice is not central to the group's system of belief. *Id.*

At trial, defendants did not act as inquisitors, seeking to admit testimony regarding plaintiff's religious beliefs, but merely tried to show that their fears for Susan's physical and emotional well–being were well–grounded. To assess defendants' state of mind, the trial court admitted evidence purporting to illustrate defendants' fear that The Way's method of recruitment resembled a process of programmed manipulation devised to allay the suspicions and anesthetize the rational processes of its targets. Publication by The Way of a guide on "The 'How' of Door to Door Witnessing," instructing recruiters to focus on "the hungry" and on "individuals whose resistance is temporarily lowered because of loneliness, worry over exams, or other adolescent crises," suggests that a reasonable basis for defendants' fears did indeed exist. The court therefore permitted references to Susan's psychological and physical condition, the extent and manner of her participation in the program of the cult, the demands of membership, and her living conditions during the summer that she "witnessed" for the cult.

 The admission of evidence for the purpose of showing good faith may have the unintended effect of prejudicing a jury by bringing out facts regarding religious belief. Aware of the potential impact of such testimony, the trial judge instructed the jury on no fewer than six occasions as to the purpose of the evidence and the context in which it could be considered and upheld objections to testimony bearing on religious belief. Since an award of punitive damages rests with the discretion of the jury, *Nelson v. Halvorson*, 117 Minn. 255, 135 N.W. 818 (1912), to have excluded all evidence bearing a potentially prejudicial impact would have eviscerated defendants' right to defend against the charge of intentional infliction of emotional distress. We therefore find that in an action for intentional infliction of emotional distress, when the record discloses no testimony impinging upon religious belief, the introduction by defendants of relevant evidence concerning matters that plaintiff voluntarily placed in issue, such as her religious association and defendants' state of mind, was admissible and did not violate the First Amendment admonition respecting freedom of religion.

3. Plaintiff next challenges a charge to the jury by the trial judge instructing that when assessing plaintiff's credibility, the jury could properly take into account whether The Way was maintaining or financing the law suit. Plaintiff argues that the instruction, culminating after a lengthy trial involving several causes of action, extensive discovery proceedings, a plethora of motions and a number of hearings, constituted reversible error.

 In the past, this court has observed that a trial court's charge to the jury must be reviewed in its entirety, interpreting the instructions as a whole and refraining from considering isolated statements without reference to context. *Thomas v. Mueller*, 251 Minn. 470, 88 N.W.2d 842 (1958); *Lund v. Minneapolis Street Ry.*, 250 Minn. 550, 86

N.W.2d 78 (1957). At trial, reference was made to whether plaintiff was the real party in interest or merely a conduit through which other parties were maintaining the action. As a matter of law, the court ruled that defense inadmissible, subsequently instructing that such facts could only be considered in determining plaintiff's credibility and ascertaining appropriate damages. In otherwise instructing the jury, the trial court clearly and accurately described the torts of false imprisonment and intentional infliction of emotional distress and ruled as a matter of law that certain defenses asserted by defendants were inapplicable. The trial court also informed the jury that evidence implicating The Way could only be considered in the limited context of establishing whether defendants acted wantonly, willfully or maliciously; that inquiry, in turn, related only to the assessment of punitive damages and not to the ultimate questions of liability.

In general we believe it unwise to sanction a jury instruction providing that when a group supports a plaintiff or derives a benefit therefrom, evidence of such support can be introduced at trial relative to the question of damages. The ultimate effect of such a ruling might deter litigants from accepting the assistance of unpopular groups fearing that this evidence could affect the disposition of a case. In *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed. 405 (1963), the United States Supreme Court held such relationships to be modes of expression and association protected under the First Amendment. *Button* concerned the NAACP's practice of advising individuals during informational meetings of its willingness to commence civil rights litigation on their behalf. Challenged under a statute forbidding solicitation of legal business by an organization that retains a lawyer in connection with an action to which it is neither a party nor has a pecuniary right or liability, the United States Supreme Court found the statute unconstitutional.

The purpose of a jury instruction is to convey a clear and correct understanding of the law of the case as it relates to all the parties involved. A charge that is substantially correct is sufficient when an error has not been given such undue prominence as to obscure issues of primary significance. *St. George v. Lollis*, 209 Minn. 322, 296 N.W. 523 (1941); *See Gibbon Farmers Elevator Co. v. Herschmann*, 160 Minn. 326, 200 N.W. 293 (1924). Therefore, although we find that the trial court may have erred in instructing that the jury could consider evidence of the cult's financial support in assessing plaintiff's credibility, because the instruction constituted a small part of an otherwise commendable exposition and did not affect the ultimate disposition of the case as evidenced by the award of $10,000 in punitive damages, we hold that the commission of the error, if any, does not merit reversal.

4. Plaintiff further challenges the decision of the trial court, charging that the court erred by directing a verdict in favor of the plaintiff's former minister, Paul Sorlien. In so doing, plaintiff attributes to Paul Sorlien a degree of participation in the events in question that bears no relation to the actual facts of the case.

The active involvement of Paul Sorlien began when he accompanied his parishioner, Norman Jungclaus, to Moorhead, Minnesota to pick Susan up at the close of her examinations and then drove them to Minneapolis to the home of Veronica Morgel. Sorlien had become concerned about Susan following conversations with her parents and was previously acquainted with Morgel by reason of an informational seminar that they both attended on the subject of religious cults. The trio arrived at the Morgel residence at approximately 7 p. m. at which time Sorlien was called away to assist a parishioner who had been transferred unexpectedly to a Minneapolis hospital. Sorlien returned at approximately 11 p. m. and consequently was unaware of the circumstances surrounding Susan's removal to the downstairs bedroom. Susan became hysterical when he walked downstairs to greet her, and he therefore immediately left the room. The next day Sorlien again entered the room and observed Susan curled up in a

fetal position with her fingers in her ears. Upon seeing him, Susan once again became hysterical. Sorlien attributed her hysterical reactions to her indoctrination by The Way that ministers are "adversary, part of the devil." Sorlien spent the remainder of the day visiting three parishioners in three different metropolitan hospitals. On Wednesday, Sorlien was present but not party to a conversation between Susan and another individual but later that afternoon Sorlien exchanged pleasantries with Susan and noticed that her appearance and demeanor were markedly different. On Thursday, he returned to Bird Island to make funeral arrangements for a parishioner and to teach a confirmation class. He had no other significant contacts or conversations with the Jungclauses or Susan following his departure.

Under the applicable standard recently reiterated in *J. N. Sullivan & Associates, Inc. v. F. D. Chapman Construction Co.*, 304 Minn. 334, 231 N.W.2d 87 (1975), we find the evidence against Paul Sorlien insufficient to present a question of fact for the jury to decide, and accordingly, uphold the directed verdict of the trial court.[3]

5. As a final matter, plaintiff appeals the denial by the trial court of her motion to amend the complaint for the purpose of substituting the proper names of those previously identified in the complaint as John Doe, James Roe, Jane Doe and Mary Roe. Also included in the above motion was the further request to include an additional cause of action for civil conspiracy under 42 U.S.C. § 1985 (1976).[4]

Minn.R.Civ.P. 9.08 provides that when a litigant in his pleadings alleges ignorance as to the name of an opposing party, the opposing party may be designated by any name; after discovery of the true name, the pleadings may be amended accordingly. By identifying the parties in such manner, defendants are on notice that the complaint will be amended. Because of the perfunctory nature of the rule, we conclude that the trial court erred by failing to permit the substitution. *See LaSalle Cartage Co. v. Johnson Brothers Wholesale Liquor Co.*, 302 Minn. 351, 225 N.W.2d 233 (1974). In respect to that part of the motion seeking the addition of a new federal cause of action, however, we find the trial court did not err. The addition of a new cause of action almost a year after commencement of the suit would have likely delayed the start of trial or prejudiced the adverse party. Leave to amend will only be granted when justice so requires. Minn.R. Civ.P. 15.01.

Neither in her brief nor in her notice of appeal does plaintiff indicate what relief she seeks as a result of this error. Because plaintiff only sought punitive damages of $10,000, for which she had already been compensated, the substitution of the remaining defendants would only have resulted in a symbolic award. Hence, under Minnesota's harmless error rule, the refusal of the trial court to take such action did not appear to affect the substantial rights of the parties. Minn.R.Civ.P. 61. We therefore hold that the failure of the trial court to permit the substitution of the true and correct name of a party joined in a com-

---

3. At trial, plaintiff sought the production of personal correspondence between Sorlien and his bishop. The trial court denied discovery ruling that the documents sought were not reasonably calculated to lead to relevant evidence under Minn.R.Civ.P. 26.02(1). On appeal, plaintiff argues that the trial court's failure to permit discovery was mistakenly based on Minn.Stat. § 595.02, subd. 3 (1978), imposing a clergyman–penitent privilege, which plaintiff argued was not relevant to the facts of the case. While we disagree with plaintiff's characterization of the ruling of the trial court, because we deem the directed verdict proper, the issue is moot.

4. In respect to § 1985, a federal district court recently held that where defendant was motivated by paternal concerns for a plaintiff's health and well–being and not from the abhorrence of plaintiff's religious views, plaintiff failed to establish the existence of a class–based animus necessary to allege a violation under 42 U.S.C. § 1985 (1976). *Weiss v. Patrick*, 453 F.Supp. 717 (D.R.I.), aff'd, 588 F.2d 818 (1st Cir. 1978), cert. denied, 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979).

plaint by a fictitious name does not constitute reversible error when doing so would have resulted only in a symbolic award.

Affirmed.

PETERSON, Justice (concurring specially).

I concur in the result.

AMDAHL and SIMONETT, JJ., not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

WAHL, Justice (dissenting in part, concurring in part).

I must respectfully dissent. In every generation, parents have viewed their children's religious and political beliefs with alarm and dismay if those beliefs were different from their own. Under the First Amendment, however, adults in our society enjoy freedoms of association and belief. In my view, it is unwise to tamper with those freedoms and with longstanding principles of tort law out of sympathy for parents seeking to help their "misguided" offspring, however well–intentioned and loving their acts may be. Whether or not, as the majority opinion asserts, The Way of Minnesota, Inc. is a "youth–oriented," "pseudo–religious group" which pursues its "fundraising strategy" in such a way as to inflict physical and psychological harm on its members, emphasis on this characterization beclouds the purely legal issues which are presented by this appeal.

The first of those legal issues is whether, as a matter of law, any of the defendants in this case are guilty of false imprisonment of the plaintiff. The elements of the tort of false imprisonment are (1) words or acts by defendant intended to confine plaintiff, (2) actual confinement, and (3) awareness by plaintiff that she is being confined. *Blaz v. Molin Concrete Products Co.,* 309 Minn. 382, 244 N.W.2d 277 (1976). Any imprisonment "which is not legally justifiable" is false imprisonment, *Kleidon v. Glascock,* 215 Minn. 417, 10 N.W.2d 394 (1943); therefore,

the fact that the tortfeasor acted in good faith is no defense to a charge of false imprisonment. *Accord, Strong v. City of Milwaukee,* 38 Wis.2d 564, 157 N.W.2d 619 (1968). Thus, although the majority opinion correctly concludes that evidence concerning the activities of The Way and the impact of those activities upon plaintiff may have been relevant to the question of whether defendants acted so willfully and maliciously as to justify an award of punitive damages, such evidence has little bearing on the issue of defendants' liability for false imprisonment.

The unrebutted evidence shows that defendant Norman Jungclaus, the father of the 21–year–old plaintiff in this case, took his adult daughter, kicking and screaming, to a small bedroom in the basement of the Morgel home on Monday, May 23. Norman Jungclaus admitted that she did not go with him willingly. Plaintiff curled up on the bed, plugged her ears, and cried. Defendant Perkins testified that plaintiff screamed and cried and pleaded with several people to let her go, but her pleas were ignored. This situation continued until 3 a. m. Tuesday. At one point that morning, plaintiff flew at her father, and he held her arms around her from the back, in his words, "for maybe a half an hour, until she calmed down again." Plaintiff testified that defendant Mills told her papers had been drafted to commit her to Anoka State Hospital if she continued to refuse to cooperate with the "deprogramming."

In its memorandum accompanying the order denying plaintiff's motion for judgment notwithstanding the verdict, the trial court stated:

It should be noted that there must be considerable room for doubt concerning that portion of the verdict finding that Norman Jungclaus did not participate in a false imprisonment. The evidence is unrebutted that he picked up his 21–year–old daughter Susan and took her into the basement without her permission or consent, and against her will. She remained there several days. However, Plaintiff stated that she was not seeking

compensatory damages against her parents, and only $1.00 in punitive damages.

In that light, judgment notwithstanding verdict as to false imprisonment would be of no significance in the matter of compensatory damages. And whether or not Mr. Jungclaus's act was done maliciously or willfully so as to justify $1.00 punitive damages is clearly a matter for determination by the jury; and not the Court. Hence, judgment notwithstanding verdict against Norman Jungclaus as to false imprisonment must be denied. On practical grounds, a new trial will not be ordered for a potential $1.00 recovery in any event.

Thus, the trial court refused to grant judgment against Norman Jungclaus because any damages awarded would be insignificant. However, plaintiff's complaint sought not only money damages but an injunction against further interference with her freedoms of religion, association, and expression. The value to plaintiff of a judgment in her favor, while not monetary, is nevertheless significant.

The majority opinion finds, in plaintiff's behavior during the remainder of the 16–day period of "deprogramming," a reasonable basis for acquitting defendant Jungclaus of the false imprisonment charge for the initial three days, during which time he admittedly held plaintiff against her will. Under this theory, plaintiff's "acquiescence" in the later stages of deprogramming operates as consent which "relates back" to the events of the earlier three days, and constitutes a "waiver" of her claims for those days. Cases cited by the majority do not lend support to this proposition. *Bustamonte* addressed the meaning of "voluntary consent" to the search of an automobile by police in the context of a challenge based on Fourth Amendment grounds. In *Faniel* the court found that an employee, who was given a ride to her home by company personnel who intended to recover unauthorized electrical equipment, had not proved an absence of lawful con-

sent sufficient to sustain a finding of false imprisonment.[1]

Moreover, *Weiss* does not lend support to the majority's finding. While it is true that in *Weiss* the plaintiff testified that she was forcibly detained against her will, the court found her testimony not credible. *Id.* at 721. The court there found only that parents

> have the right which all citizens have to peaceably dissuade Plaintiff of her particular religious views, provided they use no form of unlawful compulsion to effect their purpose. What occurred here was simply an effort, in private, to persuade a willing listener to disavow the tenets of the Unification Church. * * *
>
> * * * * * *
>
> It is clear that Plaintiff has the right to be free of any coercive attempt to speak with her * * *.

*Id.* at 722.

Certainly, parents who disapprove of or disagree with the religious beliefs of their adult offspring are free to exercise their own First Amendment rights in an attempt, by speech and persuasion without physical restraints, to change their adult children's minds. But parents who engage in tortious conduct in their "deprogramming" attempts do so at the risk that the deprogramming will be unsuccessful and the adult children will pursue tort remedies against their parents. To allow parents' "conviction that the judgmental capacity of their [adult] child is impaired [by her religious indoctrination]" to excuse their tortious conduct sets a dangerous precedent.

Here, the evidence clearly supported a verdict against Norman Jungclaus on the false imprisonment claim, and no reasonable basis existed for denying judgment notwithstanding the verdict. The trial court's holding in this regard should be reversed.

The second issue which particularly concerns me was the instruction by the trial

---

**1.** Indeed, *People v. White*, 53 Mich.App. 51, 218 N.W.2d 403 (1974), affirming the defendant's conviction for attempted kidnapping, held that later consent does not relate back to previous acts by defendant. *Id.* at 55–56, 218 N.W.2d at 405.

court that the jury could consider the fact that The Way paid plaintiff's legal bills in assessing her credibility and awarding damages. I concur with the court's holding that such an instruction is error, although in the context of this case harmless error. I write to emphasize the compelling reasons why such an instruction should not be given. First, the fact that The Way aided and encouraged plaintiff to bring the lawsuit has little to do with whether the defendants falsely imprisoned the plaintiff or whether they intentionally inflicted emotional distress on her. It is not uncommon for a layperson to talk to others and get advice before bringing a lawsuit. Nor is it uncommon for groups to provide money and other support to its members as they pursue individual causes of action. The contributions of the NAACP, which financially assists litigation aimed at eliminating racial barriers, were recognized, as the majority opinion notes, in *NAACP v. Button*, 371 U.S. 415, 431, 83 S.Ct. 328, 337, 9 L.Ed. 405 (1963). Such aid not only allows a person to exercise his or her right to seek redress through our courts, it also effectuates that fundamental underpinning of our judicial system.

In the instant case, to admit evidence that The Way paid plaintiff's attorneys fees improperly shifted the jury's attention from the nature of defendants' acts to the acceptability of The Way. Such a shift of attention could unduly prejudice plaintiff because she exercised her First Amendment right of association with an unpopular religious group.

Furthermore, that evidence was irrelevant to the motive for her claim for damages. The reason plaintiff altered the amounts of compensation sought from her parents was, according to her testimony, her belief that she had to sue for money. Only after the suit was commenced did she learn that she could sue for legal protection. Plaintiff was entitled to seek compensation from the defendants individually, all together, or in any combination. Therefore, that she chose to sue her parents for a token amount has little to do with who was paying the legal fees.

The fact that a group or others support a plaintiff and may derive some benefit unrelated to plaintiff's cause of action should not be introduced at trial and considered by the jury as it determines plaintiff's credibility and the amount of damages to be awarded. The ultimate effect can only be to deter plaintiffs and defendants from accepting assistance from groups or causes which may not be popular in our society. This would mean that in suits like the present one, plaintiffs with unpopular beliefs who cannot afford costly legal representation must forgo their rights to seek redress in our courts or utilize the courts at the risk that evidence of support from their minority religious or political group may be used to undermine all or part of their claims.

Lastly, I would address plaintiff's claim that the trial court erred in denying her motion to amend her complaint or add a new cause of action. I agree that the motion was properly denied because it was untimely, but I would not conclude, as suggested by footnote 4 of the majority opinion, that defendant parents' attempts to "deprogram" their daughter from her religious beliefs did not constitute a violation of her rights under 42 U.S.C. § 1985(3). Although one federal court has so held, *see Weiss v. Patrick*, 453 F.Supp. 717, 722 (D.R. I.), *aff'd*, 588 F.2d 818 (1st Cir. 1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979), a number of courts have reached the contrary conclusion. In *Augenti v. Cappellini*, 84 F.R.D. 73 (M.D.Pa.1979), for example, defendants' arguments that their attempts to deprogram their son "were motivated solely by parental concern * * * to further his physical and mental health" did not persuade the court that the "invidiously discriminatory animus" necessary for a § 1985(3) action was lacking. *Id.* at 78. Several other cases interpreting the legislative history of § 1985(3) have determined that the protection of the provisions does extend to religious groups. *See Jackson v. Associated Hospital Service*, 414 F.Supp. 315 (E.D.Pa.1976), *aff'd*, 549 F.2d 795 (3rd Cir.), *cert. denied*, 434 U.S. 832, 98

S.Ct. 117, 54 L.Ed.2d 93 (1977); *Rankin v. Howard*, 457 F.Supp. 70, 74–75 (D.Ariz. 1978); *cf. Mandelkorn v. Patrick*, 359 F.Supp. 692, 697 (D.D.C.1973). In reaching this conclusion, the court in *Baer v. Baer*, 450 F.Supp. 481 (N.D.Cal.1978) observed:

> While religious status may differ from racial status because it is not a congenital and inalterable trait, membership in a minority religious group, like membership in a minority racial group, has often excited the fear, hatred and irrationality of the majority. Two thousand years of human history compellingly prove that no easier road to martyrdom is found than in adherence to an unpopular religious faith. For these reasons, and because the legislative history does not indicate otherwise, this court concludes that religious discrimination may be encompassed by the terms of § 1985(3).

*Id.* at 491.

OTIS, Justice (dissenting in part).

I join in the views expressed by Justice Wahl, and particularly take issue with a rule which authorizes what is euphemistically described as "limitations upon the adult child's mobility" whenever a parent, or indeed a stranger acting for a parent, subjectively decides, without the benefit of a professional opinion or judicial intervention, that the adult child's "judgmental capacity" is impaired and that she should be "extricated" from what is deemed to be a religious or pseudo–religious cult.

> The rule adopted by the majority states: We hold that where parents, or their agents, acting under the conviction that the judgmental capacity of their adult child is impaired, seek to extricate that child from what they reasonably believe to be a religious or pseudo–religious cult, and the child at some juncture assents to the actions in question, limitations upon the child's mobility do not constitute meaningful deprivations of personal liberty sufficient to support a judgment for false imprisonment.

We furnish no guidelines or criteria for what constitutes "impaired judgmental capacity" other than the fact that the adult child has embraced an unorthodox doctrine with a zeal which has given the intervenor cause for alarm, a concern which may be well–founded, ill–founded, or unfounded.

Nor do we specify whether the "cult" must be for a benign or a malevolent purpose. It is enough that the intervenor has reason to believe it is a cult i. e. "an unorthodox system of belief" and that at some juncture during the adult child's involuntary confinement, she "assents," that is to say, yields or surrenders, possibly from exhaustion or fatigue, and possibly for a period only long enough to regain her composure.

If there is any constitutional protection we should be slow to erode it is the right of serious–minded people, young or old, well–adjusted, or maladjusted, to search for religious or philosophical fulfillment in their own way and in their own time without the interference of meddling friends or relatives, however well–intentioned they may be.

At age 21, a daughter is no longer a child. She is an adult. Susan Peterson was not only an adult in 1976 but she was a bright, well–educated adult. For whatever reason, she was experiencing a period of restlessness and insecurity which is by no means uncommon in students of that age. But to hold that for seeking companionship and identity in a group whose proselyting tactics may well be suspect, she must endure without a remedy the degrading and humiliating treatment she received at the hands of her parents, is, in my opinion, totally at odds with the basic rights of young people to think unorthodox thoughts, join unorthodox groups, and proclaim unorthodox views. I would reverse the denial of recovery as to that cause of action.