## STATE v. HARLEY DALANE HEMBD.

232 N. W. 2d 872.

August 15, 1975—No. 44638.

*C. Paul Jones,* State Public Defender, and *Robert Christensen,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Michael McGlennen* and *Vernon E. Bergstrom,* Assistant County Attorneys, for respondent.

Heard before Sheran, C. J., and Todd and Knutson, JJ., and considered and decided by the court en banc.

OTIS, JUSTICE.

This is an appeal from a judgment of conviction for the crime of false imprisonment. Defendant assigns as error the trial court's refusal to receive in evidence complainant's hospital records, and its failure to instruct the jury with regard to the defense of good motive. We reverse.

Complainant, a 22-year-old woman, spent the evening of February 28, 1973, at the C C Tap in south Minneapolis. She was unable to disclose the amount of beer she had consumed while there, but testified that she was not intoxicated. She left her friends at 1 a. m. when the tavern closed and proceeded to walk east along 28th Street. As she walked between Chicago and Columbus Avenues, she was approached from behind by the defendant. Over her objection he grabbed her coat and told her he

wanted to talk to her over a cup of coffee. He then seized her hand and bent her over a picket fence.

Her screams were overheard by an area resident who, from her window, saw the man lean over complainant and force her into his car. The resident called the police and, upon their arrival, gave them a description of defendant's car. She testified that she overheard defendant stating that he did not want to hurt complainant and that she should stop screaming. Complainant testified that defendant threw her into his vehicle, which was parked approximately a half block away and that she was forced to remain with him although she objected and attempted to escape. Defendant then drove off, holding her with his right hand and working the manual transmission of his automobile with his left hand.

Two police squad cars dispatched to the area received the description of the automobile and located it at the intersection of Lake Street and Portland Avenue, where it was stopped at a red light. One of the police officers noticed that the driver had his right arm around a woman passenger. Complainant testified that defendant then told her, "Now be quiet * * * [a]nd stop crying, there's a police car right next to us." As one squad car pulled in front of the vehicle, complainant began to struggle, kick, and scream. The police officers alighted from their cars and approached defendant's car.

Police Officer Dennis A. Bernstrom testified that the engine of the car was racing as if it was not in gear, and that he observed defendant trying to shift. According to Officer David A. Dobrotka, defendant was holding the woman by the neck and was attempting to shift the car into a proper gear to move ahead. After Officer Bernstrom pounded on the window, defendant released complainant, the car door was opened, and complainant jumped out, running away in a state of hysteria until returned to the squad car by one of the officers. After hearing her complaints, the officers placed defendant under arrest and advised him of his constitutional rights. One of the officers testified that

defendant said "he was trying to save her from committing suicide, and he kept this up, stating that he had observed her crying, had asked her what was wrong, and she said she was going to commit suicide." Complainant acknowledged that defendant did not molest her sexually, that he had no weapon, that he did not threaten to hold her for ransom, and said he would not hurt her.

Subsequently defendant told the police officers that he had observed complainant walking along 28th Street crying, and that he stopped his car and approached her. He stated that she told him she had attempted to commit suicide six times in the past and that she was about to attempt it again. Following an effort to console her, he decided to take her to a police station. He admitted that he forced her into the car and that she was screaming.

Complainant testified on direct examination that on February 2, 1970, she had attempted to commit suicide by taking sleeping pills. She stated that she was taken to General Hospital that evening and released the next morning. She denied any prior or subsequent attempts to take her own life.

On cross-examination complainant denied telling defendant she contemplated suicide or had attempted it in the past. She again admitted only one suicide attempt.

Defendant offered to prove that the General Hospital records which he had subpoenaed would show that complainant "* * * had attempted suicide through an overdose of aspirin approximately four years previous to the 1970 date," when she admitted attempting suicide. The court refused to permit defense counsel to ask complainant in the presence of the jury to waive her medical privilege. Complainant was then asked by the prosecutor in chambers if she would waive the privilege, to which she stated, "No, I don't want him to use it." Defense counsel responded, "You then claim medical privilege in this matter and refuse introduction into evidence of the file from General Hospital?" She replied, "Yes." In response to defendant's argument

that examination of complainant by the state regarding these records waived her privilege, the court concluded that the state had no authority to effect such a waiver over a witness' objection.

1. The physician-patient privilege is contained in Minn. St. 595.02, which provides, in part:

"Every person of sufficient understanding, including a party, may testify in any action or proceeding, civil or criminal * * * except as follows:

\* \* \* \* \*

"(4) A licensed physician or surgeon, dentist, or chiropractor shall not, *without the consent of his patient,* be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity * * *." (Italics supplied.)

We stated in State v. Fontana, 277 Minn. 286, 292, 152 N. W. 2d 503, 507 (1967), that the privilege applies to both private physician-patient relationships and those between state-employed physicians and patients confined in state hospitals.

"* * * The statute clearly provides that the physician shall not disclose any information or any opinion derived from attending the patient in a professional capacity without the consent of the patient."

In State v. Staat, 291 Minn. 394, 403, 192 N. W. 2d 192, 199 (1971), we recognized by way of dictum the problems inherent in the application of the statute to particular criminal cases, and suggested that it was "in urgent need of revision." Subsequent to our decisions in Fontana and Staat, the United States Supreme Court struck down common-law and statutory rules of evidence which unconstitutionally restrict the right of cross-examination in violation of the confrontation clause of the Sixth Amendment. In light of those decisions, we hold that the exclu-

sion of complainant's medical records, offered to show her prior attempts at suicide, was reversible error.

In Chambers v. Mississippi, 410 U. S. 284, 93 S. Ct. 1038, 35 L. ed. 2d 297 (1973), the defendant, Leon Chambers, was tried and convicted of murdering a policeman. Before trial, Gable McDonald gave the defendant's attorneys a sworn confession that he, McDonald, shot the officer. A month later McDonald repudiated his confession. At Chambers' trial, the defendant was permitted to introduce the confession but was not allowed to cross-examine McDonald with respect to his repudiation. The trial court ruled that defendant could not cross-examine McDonald since he had called him as his own witness. Defendant also offered to show that three witnesses would testify, if called, that McDonald had confessed to each of them that he had shot the officer. This testimony was excluded as hearsay. The Supreme Court of Mississippi affirmed the conviction. On appeal to the United States Supreme Court, the conviction was reversed and the case remanded. With only one judge dissenting, the court held that the common-law rule of Mississippi preventing a party from impeaching his own witness, as well as the hearsay rule of that state, was subordinate to the constitutional right of confrontation implicit in the right of cross-examination. The court noted:

"* * * To the extent that McDonald's sworn confession tended to incriminate him, it tended also to exculpate Chambers. And, in the circumstances of this case, McDonald's retraction inculpated Chambers to the same extent that it exculpated McDonald." 410 U. S. 297, 93 S. Ct. 1047, 35 L. ed. 2d 310.

With respect to the exclusion of hearsay testimony, the court said:

"* * * [W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

"We conclude that the exclusion of this critical evidence,

coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." 410 U. S. 302, 93 S. Ct. 1049, 35 L. ed. 2d 313.

A year later the Supreme Court adopted a rule in Davis v. Alaska, 415 U. S. 308, 94 S. Ct. 1105, 39 L. ed. 2d 347 (1974), which is squarely in point. That case involved the exclusion of privileged information. Davis, a juvenile, was charged with burglary. Richard Green was a crucial witness for the prosecution. He was only 16 years old at the time of the robbery. The state, relying on Alaska Stat. § 47.10.080(g) (1962), secured from the trial court a protective order to prevent the defendant from impeaching Green's testimony by disclosing his juvenile criminal record. The Alaska statute provided in part:

"* * * The commitment and placement of a child and evidence given in the court are not admissible as evidence against the minor in a subsequent case or proceedings in any other court * * *."

Following affirmance of defendant's conviction by the Alaska Supreme Court, Davis v. State, 499 P. 2d 1025 (1972), the United States Supreme Court granted certiorari and reversed the conviction, holding that defendant had been denied his right of confrontation. In so doing, the court stated:

"The claim is made that the State has an important interest in protecting the anonymity of juvenile offenders and that this interest outweighs any competing interest this petitioner might

have in cross-examining Green about his being on probation. * * *

"We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. Cf. *In re Gault*, 387 U. S. 1, 25 (1967). Here, however, petitioner sought to introduce evidence of Green's probation for the purpose of suggesting that Green was biased and, therefore, that his testimony was either not to be believed in his identification of petitioner or at least very carefully considered in that light. Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record—if the prosecution insisted on using him to make its case—is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.

\* \* \* \* \*

"\* \* \* [W]e conclude that the State's desire that Green fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself.

"The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness. \* \* \* [T]he State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records." 415 U. S. 319, 94 S. Ct. 1111, 39 L. ed. 2d 355.

The rule adopted in Davis clearly governs the facts of this case. The whole theory of the defense was defendant's claim that com-

plainant disclosed to him her intention to commit suicide. She twice unequivocally denied while on the stand that she had made more than one attempt to take her own life. Defendant offered to show by introducing her medical records that she had made other attempts at suicide. The refusal to receive such records because of the statutory privilege denied defendant his constitutional right of confrontation under the rule adopted in Davis. On retrial, therefore, we hold that the statutory privilege must give way to the Sixth Amendment as the Supreme Court has now construed it.

2. Defendant's theory of defense was that he was not guilty of violating the false imprisonment statute since his only purpose in detaining complainant was to protect her from harm.[1] Although defendant did not testify, the contentions he made were supported by Officer Bernstrom, who took him into custody. That officer testified as follows:

"Well, the defendant kept on making statements that he wasn't trying to hurt the girl, that he was trying to save her from committing suicide. And he kept this up, stating that he had observed her crying, had asked her what was wrong, and she said she was going to commit suicide. And he said, 'That was all I was trying to do was trying to save her from committing suicide.' "

Defendant's statement to the police that he was trying to prevent the complainant from committing suicide was corroborated to some extent by her own testimony that she had in fact attempted suicide 3 years before.

In his closing argument, the prosecutor stated to the jury:

---

[1] Minn. St. 609.255 provides as follows: "Whoever, knowing he has no lawful authority to do so, intentionally confines or restrains a child not his own under the age of 18 years without his parent's or legal custodian's consent, or any other person without his consent, is guilty of false imprisonment and may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both."

"* * * You'll receive instructions on the crime of what we call False Imprisonment. Now, the elements here are knowingly removing a person or confining a person with intent to confine and without that person's consent. Three basic elements. This is called False Imprisonment."

Later in his argument, the following colloquy took place among the prosecutor, the defense counsel, and the court:

"MR. GAFFNEY: * * * I don't care if his motive was good, it doesn't make any difference in False Imprisonment. He didn't have the consent to confine this girl. None whatsoever.

"MR. CHRISTOPHERSON: Your Honor, I would object, misstatement of the law. The intent is necessary in False Imprisonment, and I ask the Court to correct counsel on it.

"THE COURT: Sustained.

"MR. GAFFNEY: Your Honor, I will direct myself to the motive expressed by the defendant, that he was going to confine her to save her life. But I'm saying that it doesn't make any difference if he wanted to save her life, he had no consent from this woman to confine her. And it was his intent to confine her, regardless."

Defense counsel made no further objection to the prosecutor's statement of the law and requested no instruction that good motive is a defense in a prosecution for false imprisonment. Nor did counsel take exception to the charge as given, which stated in part:

"* * * You are instructed that as elements of the crime of False Imprisonment the State must prove beyond a reasonable doubt the following: That on the 1st day of March, 1973, in the City of Minneapolis, Hennepin County, Minnesota, the defendant knowing he had no lawful authority to do so, intentionally confined or restrained [complainant] without her consent."

The only authorities which have come to our attention hold that good motive or purpose is a valid defense to a criminal

charge for false imprisonment. In reversing such a conviction, the Supreme Court of Pennsylvania held in Commonwealth v. Trunk, 311 Pa. 555, 568, 167 A. 333, 338 (1933):

"We are also of opinion there was grave error in the trial judge's instruction that 'motive is not a factor in the correct determination of the guilt or innocence of the defendants.' 'Motive is some cause or reason that moves the will and induces action': Words & Phrases, 1st Series, page 4613. While it may be that motive is not a factor so far as the assault and battery charges are concerned, because no matter what the motive was the act was criminal, it is a most important factor in the charge of false imprisonment. * * * The trial judge should have taken into account the fact that they were police officers investigating crime. Their motive, their reason for arresting and holding him was a most important part of their defense, because it tended to justify the original act of taking into custody and his detention at least for a certain time. The motives, good faith and purpose of the defendants are legitimate matters of defense to be considered by the jury in passing upon the false imprisonment indictments, as they negative the idea of criminality."

To the same effect is Henderson v. State, 95 Ga. App. 830, 832, 99 S. E. 2d 270, 272 (1957). There, the defendant police officer was also charged and convicted of false imprisonment. The appellate court adopted language used by the Pennsylvania court in Commonwealth v. Trunk, *supra:*

"The motives, good faith, and purpose of the defendants are legitimate matters of defense to be considered by the jury in passing upon the false imprisonment indictments, as they negative the idea of criminality."

The court held that notwithstanding the defendant's failure to request an instruction with respect to that defense, on which he relied, it was reversible error for the court not to charge on that issue. In a concurring opinion the rule was stated thus (95 Ga. App. 834, 99 S. E. 2d 273):

"The defendant's animus or good faith in both making the arrest and detaining the prosecuting witness in this case was vital. The court should have so instructed the jury. One of the best settled rules of criminal law is that there can be no crime unless there was in the defendant's conduct a union or joint operation of act and intent to violate the law or a culpable negligence on his part."

We said in State v. Keaton, 258 Minn. 359, 365, 104 N. W. 2d 650, 655 (1960):

"Whether the giving of an erroneous instruction constitutes prejudicial error must, of course, be determined upon the facts of each particular case. The defendant here made no objection nor did he take any exception to the instruction at the time of trial. Neither did he raise the error in his motion for a new trial. Under such circumstances a new trial cannot be granted unless it is shown that the error was one of fundamental law or controlling principle and that it substantially and materially prejudiced the defendant's rights."

There can be no doubt that a bona fide attempt to prevent a suicide is not a crime in any jurisdiction, even where it involves the detention, against her will, of the person planning to kill herself. Had defendant seized complainant as she was about to leap from a building, and had he kept her locked in a safe place until the authorities arrived, it is clear that a conviction for the crime of false imprisonment could not be sustained.

We hold therefore that the failure to give an appropriate instruction on a matter of fundamental law substantially and materially prejudiced the defendant and that he is entitled to a new trial.

Reversed.

TODD, JUSTICE (concurring in part, dissenting in part).

I concur in that part of the majority opinion which holds that a refusal to receive into evidence medical records of complainant on the basis of an invocation of the statutory privilege effectively

denies defendant his Sixth Amendment right of confrontation under the rule enunciated in Davis v. Alaska, 415 U. S. 308, 94 S. Ct. 1105, 39 L. ed. 2d 347 (1974).

However, since this court, in State v. Fontana, 277 Minn. 286, 152 N. W. 2d 503 (1967), has precisely interpreted Minn. St. 595.02 to preclude disclosure by a physician of any medical information or opinion derived from attending a patient in a professional capacity without the patient's consent, I would expressly overrule Fontana. A comparison of the subsequent interpretation of the constitutional right of confrontation with our decision in Fontana necessitates the conclusion that the two theories are irreconcilable. By overruling Fontana, it would be possible to maintain the personal medical privilege created by the statute but read with and subject to constitutional limitations now applicable.

I dissent from that portion of the majority opinion which holds that the failure of the trial court to instruct the jury on the defense of good motive constitutes reversible error.

Minn. St. 609.255 provides:

"Whoever, knowing he has no lawful authority to do so, intentionally confines or restrains a child not his own under the age of 18 years without his parent's or legal custodian's consent, or any other person without his consent, is guilty of false imprisonment and may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both."

The majority opinion relies upon the cases of Commonwealth v. Trunk, 311 Pa. 555, 167 A. 333 (1933), and Henderson v. State, 95 Ga. App. 830, 99 S. E. 2d 270 (1957), to support its conclusion that the motives or good faith of the defendant are proper matters of defense to be considered by the jury on the trial of a criminal charge for false imprisonment. These cases may be

distinguished factually in that in both situations defendants were police officers executing their duties and acting within what they believed was their legal authority. There is no such claim here.

In Trunk, the court relied upon the fact that defendants "were police officers investigating crime. Their motive, their reason for arresting and holding [the complainant] was a most important part of their defense, because it tended to justify the original act of taking into custody and his detention at least for a certain time." 311 Pa. 568, 167 A. 338.

The Henderson case similarly involved prosecution of a state patrolman for arresting, without a warrant, a driver for drunkenness on a public highway. The officer's asserted defense was his good-faith belief that he had probable cause to conclude that an offense was being committed in his presence. The court reasoned that where this is the sole defense relied upon, it is error to fail to instruct the jury as to its elements. The applicable statute was quoted as follows:

" 'False imprisonment is a violation of the personal liberty of a person and consists in confinement or detention of such person without sufficient legal authority.' Code § 26-1501.

" 'Any person who shall arrest, confine, or detain a person without process, warrant, or legal authority to justify it, shall be guilty of a misdemeanor.' Code § 26-1502.

" 'An arrest for a crime may be made by an officer * * * without a warrant if the offense is committed in his presence * * *.' Code § 27-207." 95 Ga. App. 832, 99 S. E. 2d 272.

The court concluded that motive and good faith are legitimate matters of defense to be considered by the jury in passing upon false imprisonment indictments because they "negative the idea of criminality." It would appear that statutory construction would allow this interpretation. Ga. Code § 26-1502, *supra,* indicates that there is an implied allowance for the belief that there was legal authority to confine; i.e., a belief by defendant officer that he had probable cause to arrest.

However, since Minn. St. 609.255, unlike the interdependent statutes considered in Henderson, seemingly focuses only upon an intent to confine, the suggested defense would appear to be germane only to the knowledge of legal authority to confine or to a belief that consent had been given.

Practically speaking, there are situations which may arise in which an alleged defense of good motive would be wholly proper in a prosecution for false imprisonment. The trial court may then, after receiving and reviewing the evidence, within its discretion determine whether the jury should be so instructed. Such was apparently the procedure here, with the court determining that the evidence did not establish that this was a proper consideration for the jury.

As discussed fully in the majority opinion, the record indicates a rather substantial dispute in the focal evidence upon which defendant relies in asserting the defense of good motive to the criminal charge of false imprisonment. Despite repeated claims by defendant that his actions were directed at preventing a suicide attempt by complainant, there is evidence that as the police officers approached the automobile in which complainant was confined, defendant did not immediately release her. Further, complainant testified that defendant told her, "Now be quiet * * * [a]nd stop crying, there's a police car right next to us."

With this evidence before the court, a discretionary determination was made that an instruction regarding good faith or motives was not proper. I would, therefore, allow this determination to stand.

MR. JUSTICE SCOTT took no part in the consideration or decision of this case.