William **EILERS**, Plaintiff,

v.

**Deborah Ann COY, Daniel Charles Graham, Robert Lewis Brandyberry, Larry Bisman, Vincent Jennings, Defendants.**

Civ. No. 4–82–1329.

United States District Court,
D. Minnesota,
Fourth Division.

March 6, 1984.

Lee Boothby and Robert A. Yingst, Boothby, Huff & Yingst, Berrien Springs, Mich., for plaintiff.

William M. Schade, Somsen, Dempsey & Schade, New Ulm, Minn., Gregory F. Kuderer, Erickson, Zierke, Kuderer, Myster, Madsen & Wollschlager, Fairmont, Minn., and Xavier E. Grenas, Houston, Tex., for defendants Deborah Ann Coy, Daniel Charles Graham and Larry Bisman.

Vincent Jennings, pro se.

Robert Lewis Brandyberry, pro se.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

The plaintiff in this case, William Eilers, has moved the Court to enter a directed verdict against the defendants on his claims that the defendants falsely imprisoned him and violated his civil rights during a deprogramming attempt in 1982. Both sides have submitted briefs on the question and the Court has heard oral argument.

After careful consideration the Court has decided as follows:

1. Plaintiff's motion for a directed verdict on the issue of false imprisonment is granted and the Court holds, as a matter of law, that plaintiff William Eilers was falsely imprisoned without legal justification.

2. Plaintiff's motion for a directed verdict with respect to 42 U.S.C. § 1985(3) is granted as to certain elements of the plaintiff's claim that a conspiracy on the part of the defendants deprived him of certain of his federal constitutional rights.

### FACTS

The evidence in this case has established the following facts. The plaintiff William Eilers and his pregnant wife Sandy were abducted from outside a clinic in Winona, Minnesota in the early afternoon of Monday, August 16, 1982, by their parents and

relatives and by the defendant deprogrammers who had been hired by the parents of the plaintiff and his wife. The plaintiff was 24 years old at the time and his wife Sandy was 22. The couple was living on a farm near Galesville, Wisconsin and had traveled to Minnesota for Sandy's pre-natal examination.

At the time of the abduction, Bill and Sandy Eilers were members of the religious group Disciples of the Lord Jesus Christ. There is ample evidence that this group is an authoritarian religious fellowship directed with an iron hand by Brother Rama Behera. There is also evidence that Bill Eilers' personality, and to some extent his appearance, changed substantially after he became a member of the group. These changes were clearly of great concern to members of the plaintiff's family. However, other than as they may have affected the intent of the parents of Bill and Sandy Eilers in the actions they took in seizing Bill and Sandy, the beliefs and practices of the Disciples of the Lord Jesus Christ should not be, and are not, on trial in this case.

While leaving the Winona Clinic on August 16, 1982 the plaintiff, who was on crutches at the time due to an earlier fall, was grabbed from behind by two or more security men, forced into a waiting van, and driven to the Tau Center in Winona, Minnesota.[1] Forcibly resisting, he was carried by four men to a room on the top floor of the dormitory-style building. The windows of this room were boarded over with plywood, as were the windows in his bathroom and in the hallway of the floor. The telephone in the hallway had been dismantled.

The plaintiff was held at the Tau Center for five and one-half days and subjected to the defendants' attempts to deprogram him. Shortly after his arrival at the Tau Center, and after a violent struggle with

his captors, the plaintiff was handcuffed to a bed. He remained handcuffed to the bed for at least the first two days of his confinement. During this initial period, he was allowed out of the room only to use the bathroom, and was heavily guarded during those times. On one occasion, the plaintiff dashed down the hall in an attempt to escape, but was forcibly restrained and taken back to the room. After several days of resistance, the plaintiff changed tactics and apparently pretended to consent to his confinement.

The defendants and the plaintiff's relatives had agreed in advance of the abduction that the plaintiff would be kept at the Tau Center for one week, regardless of whether the plaintiff consented to their actions. At no time during the week was the plaintiff free to leave the Tau Center, nor at any time were reasonable means of escape available to him. Three of the eight people hired by the parents were designated "security men." These individuals, described by witnesses as at least six feet tall and weighing over 200 pounds, guarded the exits on the floor at all times.

On the evening of Saturday, August 21, 1982, as the plaintiff was leaving the Tau Center to be transported to Iowa City, Iowa for further deprogramming, he took advantage of his first opportunity to escape and jumped from the car in which he was riding. Local residents, attracted by the plaintiff's calls for help, assisted plaintiff in making his escape and the police were summoned.[2]

The evidence has also shown that within three weeks before the abduction occurred, the plaintiff's relatives had contacted authorities in Trempealeau County, Wisconsin in an attempt to have the plaintiff civilly committed. Family members have testified that they believed the plaintiff was suicidal because of a letter he had written to his

---

**1.** After dropping the plaintiff at the Tau Center, one of the family members drove the van to a location eight miles outside of Winona and left it there.

**2.** The plaintiff's wife Sandy stayed with the deprogrammers and has not returned to the group Disciples of the Lord Jesus Christ of which the plaintiff is still a member. She has since divorced the plaintiff and has sole custody of the couple's infant son.

grandmother before joining the Disciples of the Lord Jesus Christ in which he wrote that demons were attacking his mind and telling him to kill himself rather than go to the Lord. Defendants' Exhibit A at 13–14. Joyce Peterson, a psychiatric social worker, interviewed the plaintiff in person on July 26, 1982. After interviewing the plaintiff and consulting with the Trempealeau County Attorney, Peterson informed the plaintiff's relatives that no legal grounds existed in Wisconsin for confining the plaintiff because he showed no signs of being a danger to himself or to others. The defendants in this case were aware of that information at the time they abducted and held the plaintiff.

## DISCUSSION

■ In considering the plaintiff's motion for a directed verdict, the Court is required to view the evidence in the light most favorable to the defendants and to resolve all conflicts in the evidence in the defendants' favor. *Dace v. ACF Industries, Inc.*, 722 F.2d 374, 375 (8th Cir.1983). A directed verdict motion should be granted only when reasonable jurors could not differ as to the conclusions to be drawn from the evidence. *Id.*

The plaintiff has alleged two main causes of action against the defendants: false imprisonment and conspiracy to deprive the plaintiff of his constitutional rights in violation of 42 U.S.C. § 1985(3). These claims will be discussed separately.

### A. False Imprisonment

■ The plaintiff's first claim is that the defendants' conduct in confining him at the Tau Center constituted false imprisonment for which the defendants had no legal justification. False imprisonment consists of three elements:

1) words or acts intended to confine a person;

2) actual confinement; and

3) awareness by the person that he or she is confined.

*Blaz v. Molin Concrete Products Co.*, 309 Minn. 382, 385, 244 N.W.2d 277, 279 (1976); Restatement (Second) of Torts § 35 (1965).

■ The evidence in this case has overwhelmingly established each of the elements of false imprisonment. By their own admission, the defendants intended to confine the plaintiff for at least one week. While the defendants maintain that their purpose was to help the plaintiff, it is not a defense to false imprisonment that the defendants may have acted with good motives. Malice toward the person confined is not an element of false imprisonment. *Strong v. City of Milwaukee*, 38 Wis.2d 564, 567, 157 N.W.2d 619, 621 (1968); *Witte v. Haben*, 131 Minn. 71, 74, 154 N.W. 662, 663 (1915); W. Prosser, *Law of Torts* 48 (4th ed. 1971).

■ There is also no question that the plaintiff was actually confined. Relying on the Minnesota Supreme Court's decision in *Peterson v. Sorlien*, 299 N.W.2d 123, 129 (Minn.1980), *cert. denied*, 450 U.S. 1031, 101 S.Ct. 1742, 68 L.Ed.2d 227 (1981), the defendants contend that there was no actual confinement because there is evidence that the plaintiff consented to the defendants' actions, at least by the fourth day of his confinement.[3] The plaintiff, in con-

---

**3.** In *Peterson*, the parents of 21-year-old Susan Jungclaus Peterson engaged deprogrammers to extricate their daughter from The Way Ministry. Peterson resisted the deprogramming for two or three days, but from then on stayed with her deprogrammers willingly for the next 13 days. At the end of the 16-day period, Peterson returned to The Way Ministry, apparently at the urging of her fiance who was also a member of the group.

Peterson then brought an action for false imprisonment against her parents, the deprogrammers, and others. After a finding for the defendants, the plaintiff appealed. Affirming the judgment for the defendants, the Minnesota Supreme Court ruled:

[W]e hold that when parents, or their agents, acting under the conviction that the judgmental capacity of their adult child is impaired, seek to extricate that child from what they reasonably believe to be a religious or psuedo-religious cult, and the child at some juncture assents to the actions in question, limitations upon the child's mobility do not constitute meaningful deprivations of personal liberty sufficient to support a judgment for false imprisonment.

trast, has testified that he merely pretended to consent in order to gain an opportunity to escape. The plaintiff's apparent consent is not a defense to false imprisonment. Many people would feign consent under similar circumstances, whether out of fear of their captors or as a means of making an escape. But in this case, unlike the *Peterson* case relied on by the defendants,[4] it is undisputed that the plaintiff was at no time free to leave the Tau Center during the week in question, nor were any reasonable means of escape available to him. Under these circumstances, the Court finds, in agreement with many other authorities, that the plaintiff's apparent consent is not a defense to false imprisonment. 32 Am. Jur.2d False Imprisonment § 15 (1982); Restatement (Second) of Torts § 36 (1965). The Court therefore holds, as a matter of law, that the plaintiff has proven the necessary elements of false imprisonment.

The next question is, given that the defendants falsely imprisoned the plaintiff, were their actions legally justified so as to preclude liability for false imprisonment? As justification for their actions, the defendants rely on the defense of necessity. They claim that the confinement and attempted deprogramming of the plaintiff was necessary to prevent him from committing suicide or from otherwise harming himself or others. *See State v. Hembd,* 305 Minn. 120, 130, 232 N.W.2d 872, 878 (1975).

■ The defense of necessity has three elements.[5] The first element is that the defendants must have acted under the reasonable belief that there was a danger of imminent physical injury to the plaintiff or to others.[6] *State v. Johnson,* 289 Minn. 196, 199–200, 183 N.W.2d 541, 543 (1971); *People v. Patrick,* 126 Cal.App.3d 952, 961, 179 Cal.Rptr. 276, 282 (1981); *People v. Patrick,* 541 P.2d 320, 322 (Colo.Ct.App. 1975); Restatement (Second) of Torts § 892(D) comment a (1979).

299 N.W.2d at 129 (footnote omitted). The court made clear, however, that it was not endorsing the practice of deprogramming:

[O]wing to the threat that deprogramming poses to public order, we do not endorse self-help as a preferred alternative. In fashioning a remedy, the First Amendment requires resort to the least restrictive alternative so as to not impinge upon religious belief. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed.2d 1213 (1940).

299 N.W.2d at 129 (footnote omitted).

**4.** As the Minnesota Supreme Court noted in its opinion, the plaintiff in *Peterson* had ample opportunities to escape, yet willingly chose to stay with her deprogrammers:

The record clearly demonstrates that Susan willingly remained in the company of defendants for at least 13 of [the 16] days. During that time she took many excursions into the public sphere, playing softball and picknicking in a city park, roller-skating at a public rink, flying aboard public aircraft and shopping and swimming while relaxing in Ohio. Had Susan desired, manifold opportunities existed for her to alert the authorities of her allegedly unlawful detention; in Minneapolis, two police officers observed at close range the softball game in which she engaged; en route to Ohio, she passed through the security areas of the Twin Cities and Columbus airports in the presence of security guards and uniformed police; in Columbus she transacted business at a bank, went for walks in solitude and was interviewed by an F.B.I. agent who sought assurances of her safety. At no time during the 13-day period did she complain of her treatment or suggest that defendants were holding her against her will.

*Peterson v. Sorlien,* 299 N.W.2d 123, 128 (Minn. 1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1742, 68 L.Ed.2d 227 (1981). In contrast, the plaintiff in this case was confined to the Tau Center, under guard, at all times and had no similar opportunities to escape.

**5.** The elements of the necessity defense in the criminal context, *see* Model Penal Code § 3.02, are analyzed in Arnolds and Garland, *The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil,* 65 J.Crim.L. & Crim. 289 (1974).

**6.** For the purposes of this motion, the Court will assume that the defendants, as agents of the plaintiff's parents, are entitled to rely on the beliefs of the parents in this regard. *See United States v. Patrick,* 532 F.2d 142, 145 (9th Cir. 1976) (trial court held beliefs of parents transfer to agents; issue not raised on appeal). *But see People v. Patrick,* 126 Cal.App.3d 952, 962, 179 Cal.Rptr. 276, 282–83 (1981) (agents must personally believe in justifiability of their actions and must "take all appropriate steps necessary to investigate the reasonableness of the beliefs held by their principals in order to convince themselves of the necessity of criminal action").

It is not clear that such a danger existed on August 16, 1982. The alleged threats of suicide made by the plaintiff were contained in a letter dated June 14, 1982, and that letter recounted impressions the plaintiff had had some time earlier. Moreover, Joyce Peterson, the psychiatric social worker who personally interviewed the plaintiff on July 26, 1982, concluded in her report, and reported to the plaintiff's relatives, that the plaintiff was not dangerous to himself or to others. Nevertheless, viewing the evidence in the light most favorable to the defendants, the Court will assume for purposes of this motion that the plaintiff was in imminent danger of causing physical injury to himself or to others.

The second and third elements of the necessity defense are intertwined. The second element is that the right to confine a person in order to prevent harm to that person lasts only as long as is necessary to get the person to the proper lawful authorities. *See State v. Hembd,* 305 Minn. 120, 130, 232 N.W.2d 872, 878 (1975) (dictum); Annot., 92 A.L.R.2d 580 (1963). The third element is that the actor must use the least restrictive means of preventing the apprehended harm. *People v. Patrick,* 126 Cal.App.3d 952, 960, 179 Cal.Rptr. 276, 282 (1981); W. LaFave and A. Scott, *Criminal Law* 387 (1972); *cf. Peterson v. Sorlien,* 299 N.W.2d 123, 129 (Minn.1980) (where religious beliefs are implicated, first amendment requires resort to least restrictive alternative).

In this case, the defendants' conduct wholly fails to satisfy either of these elements of the necessity defense. Once having gained control of the plaintiff, the defendants had several legal options available to them. They could have:

    1) turned the plaintiff over to the police;

    2) sought to initiate civil commitment proceedings against the plaintiff pursuant to Minn.Stat. § 253B.07 (1982);

    3) sought professional psychiatric or psychological help for the plaintiff with the possibility of emergency hospitalization if necessary pursuant to Minn.Stat. § 253B.05 (1982).

At no time did the defendants attempt, or even consider attempting, any of these lawful alternatives during the five and one-half days they held the plaintiff, the first five of which were business days. Instead, they took the plaintiff to a secluded location with boarded-up windows, held him incommunicado, and proceeded to inflict their own crude methods of "therapy" upon him—methods which even the defendants' own expert witness has condemned. Well aware that the police were searching for the plaintiff, the defendants deliberately concealed the plaintiff's location from the police.

It must be emphasized that the Minnesota Legislature has prescribed specific procedures that must be followed before a person can be deprived of his or her liberty on the basis of mental illness. Minn.Stat. § 253B.07 *et seq.* (1982); *see generally* Janus and Wolfson, *The Minnesota Commitment Act of 1982: Summary and Analysis,* 6 Hamline L.Rev. 41 (1983). Those procedures include examination of the proposed patient by qualified professionals, Minn.Stat. § 253B.07, subd. 1 (1982), and a judicial determination that the proposed patient is dangerous and in need of treatment, *id.,* subd. 6. Manifold procedural protections, including the right to counsel, Minn.Stat. § 253B.03, subd. 9 (1982), are afforded the proposed patient at all stages of this civil commitment proceeding. Obviously, none of these protections were afforded the plaintiff in this case.

Minnesota law also provides that, in situations where there is not time to obtain a court order, a person may be admitted or held for emergency care and treatment in a hospital, without a court order, upon a written statement by a licensed physician or psychologist that the person is mentally ill and is in imminent danger of causing injury to himself or to others. Minn.Stat. § 253B.05, subd. 1 (1982). The defendants in this case—unlicensed and untrained individuals—made no effort to obtain any such

statement from a licensed physician or psychologist.

■ The defendants' failure to even attempt to use the lawful alternatives available to them is fatal to their assertion of the necessity defense. Where the Legislature has prescribed specific procedures that must be followed before a person can be deprived of his or her liberty on the ground of mental illness, not even parents or their agents acting under the best of motives are entitled to disregard those procedures entirely.[7]

The Court has assumed for the purposes of this motion that the defendants were justified in initially restraining the plaintiff based upon their belief that he was in imminent danger of harming himself or others. But even under those circumstances, the defense of necessity eventually dissipates as a matter of law. No specific time limit can be set, because the period during which an actor is acting out of necessity will vary depending on the circumstances of each case. In this particular case, however, where the defendants held the plaintiff, a 24-year-old adult, for five and one-half days with no attempt to resort to lawful alternatives available to them, the Court could not sustain a jury verdict in the defendants' favor on the issue of false imprisonment. Accordingly, the Court rules as a matter of law that the plaintiff was falsely imprisoned without justification. The issue of what amount of damages, if any, the plaintiff suffered from this false imprisonment is a question for the jury.

**B. Section 1985(3)**

■ The next claim upon which the plaintiff has moved for a directed verdict is that the defendants conspired to and did deprive him of his federal constitutional rights in violation of 42 U.S.C. § 1985(3). The Court will direct a verdict as to some, but not all, of the elements of this claim.

A cause of action under section 1985(3) consists of the following elements:

1) a conspiracy;

2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws;

3) an act or acts in furtherance of the conspiracy; and

4) an injury to the person or property of a citizen or a deprivation of the rights and privileges of any citizen.

*Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

■ Three of these elements are clearly present in this case. By their own admission, the defendants planned and conspired to abduct the plaintiff and to hold him against his will. They committed several acts in furtherance of this conspiracy including seizing the plaintiff at the Winona Clinic, transporting him to the Tau Center, and holding him there against his will for five and one-half days. These actions were in clear violation of the plaintiff's constitutional rights, including his right not to be deprived of liberty without due process of law, *see Taylor v. Gilmartin*, 686 F.2d 1346, 1358 (10th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994

---

**7.** The author of one of the most thorough legal analyses of the subject of deprogramming has reached the following conclusions:

(1) Involuntary deprogramming should not proceed unless there has been a prior judicial determination that the individual is incompetent or under mind control.

(2) Therapy should not proceed until milder measures, including removal to a neutral environment for a period of time, have failed.

. . . .

(8) Whenever possible, deprogramming should be carried out by licensed psychologists or psychiatrists, or by lay individuals working under the supervision of a psychologist or psychiatrist.

(9) Involuntary deprogramming should be carried out only pursuant to a court order and with periodic reporting to the court.

(10) The court hearing that results in a deprogramming order should be accompanied by due process protection, including the right of the individual to appear, to be represented by counsel, and to present witnesses on his own behalf.

Delgado, *Religious Totalism: Gentle and Ungentle Persuasion Under the First Amendment*, 51 S.Cal.L.Rev. 1, 86–88 (1977) (footnotes omitted).

**1100**

(1983), and his right to freedom of interstate travel,[8] *see Ward v. Connor,* 657 F.2d 45, 48 (4th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982). The Court holds as a matter of law that the plaintiff has established the first, third, and fourth elements of his section 1985(3) cause of action.

The remaining element is that the conspiracy be for the purpose of depriving the plaintiff of the equal protection of the laws. The United States Supreme Court has interpreted this element as requiring that the defendants' conduct be motivated by class-based, invidiously discriminatory animus. *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798. In other words, in order for the plaintiff to recover under section 1985(3), the defendants must have taken action against him because of his membership in a group or class that is protected by that statute. The Court has previously ruled in this case that the religious group Disciples of the Lord Jesus Christ is a group protected by the statute. *See, e.g., Taylor v. Gilmartin,* 686 F.2d 1346, 1357–58 (10th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983); *Ward v. Connor,* 657 F.2d 45, 48 (4th Cir.1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982); *Action v. Gannon,* 450 F.2d 1227, 1231–32 (8th Cir.1971) (en banc); *Cooper v. Molko,* 512 F.Supp. 563, 569 (N.D.Cal.1981); Comment, *The Deprogramming of Religious Sect Members: A Private Right of Action Under Section 1985(3),* 74 N.W.U.L.Rev. 229 (1979). The remaining question is whether the defendants took action against the plaintiff because of an animus toward that group or, as the defendants contend, because of a concern for the welfare of the plaintiff. The Court finds that the defendants' motivation is an issue upon which reasonable jurors could differ. *See, e.g., Augenti v.*

*Cappellini,* 84 F.R.D. 73, 78 (M.D.Pa.1979). The Court therefore denies the plaintiff's motion for a directed verdict on this element of the plaintiff's section 1985(3) cause of action.

**C. Conclusion**

This will not be a popular decision. While the Court has substantial sympathy for the feelings and reactions of the parents of Bill and Sandy Eilers, this Court is sworn to uphold the law and the Constitution of the United States. **If the basic rights of an American citizen are not recognized in a federal court by a federal judge, where will they be recognized?**

Based on the foregoing, **IT IS ORDERED** that the plaintiff's motion for a directed verdict is granted as to his claim for false imprisonment (Count IV of the Second Amended Complaint), and as to certain elements of his 42 U.S.C. § 1985(3) claim (Count I of the Second Amended Complaint) described herein. The plaintiff's motion is in all other respects denied.

---

**8.** The Court does not decide whether the defendants' actions deprived the plaintiff of his first amendment right to freedom of religion as that question is intimately tied up with the question of the defendants' motivation. As discussed below, the defendants' motivation is a question for the jury.

In any event, absent state action or state involvement, a deprivation of first amendment rights is not actionable under section 1985(3). *United Bhd. of Carpenters and Joiners, Local 610 v. Scott,* —— U.S. ——, 103 S.Ct. 3352, 3357, 77 L.Ed.2d 1049 (1983).